# EXHIBIT 1

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated as of July 26, 2007, between Lightpath Technologies, Inc., a Delaware corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506 promulgated thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

ARTICLE I.
DEFINITIONS

1.1     Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 405 under the Securities Act. With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as such Purchaser will be deemed to be an Affiliate of such Purchaser.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day when all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities have been satisfied or waived.

"Commission" means the Securities and Exchange Commission.

1

"Common Stock" means the Class A common stock of the Company, par value $0.01 per share, and any other class of securities into which such securities may hereafter be reclassified or changed into.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Baker & Hostetler LLP, with offices located at 200 South Orange Avenue, SunTrust Center, Suite 2300, Orlando, FL 32801.

"Disclosure Schedules" means the Disclosure Schedules of the Company delivered concurrently herewith.

"Effective Date" means the date that the initial Registration Statement filed by the Company pursuant to the Registration Rights Agreement is first declared effective by the Commission.

"Escrow Agent" shall mean Signature Bank, a New York State chartered bank and having an office at, 261 Madison Avenue, New York, New York 10016.

"Escrow Agreement" shall mean the escrow agreement entered into prior to the date hereof, by and among the Placement Agent, the Company and the Escrow Agent pursuant to which the Purchasers shall deposit Subscription Amounts with the Escrow Agent to be applied to the transactions contemplated hereunder.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(r).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exempt Issuance" means the issuance of (a) shares of Common Stock, options, restricted stock units and awards and similar issuances to employees, officers, directors or consultants (provided that issuances to consultants shall not exceed 200,000 shares in any 12 month period (subject to adjustment for reverse and forward stock splits, recapitalizations and the like)) of the Company pursuant to any stock option, stock purchase, stock award or similar plan or arrangement duly adopted by a majority of the non-employee members of the Board of Directors of the Company or a majority of the members of a committee of non-employee directors established for such purpose, (b) shares of Common Stock issuable upon the exercise of any stock options, warrants, or similar rights outstanding as of the date hereof or which the Company is obligated to issue under any agreement or other arrangement currently in effect, (c) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, provided that such securities have not been amended since the date of this Agreement to increase the number of such

2

securities or to decrease the exercise, exchange or conversion price of any such securities, (d) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company and in which the Company receives benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities, (e) Common Stock or options or warrants (not to exceed 200,000 shares in any 12 month period (subject to adjustment for reverse and forward stock splits, recapitalizations and the like)) to purchase Common Stock issued to commercial lenders, equipment lessors, vendors or suppliers of the Company, (f) Common Stock or options or warrants (not to exceed 200,000 shares in any 12 month period (subject to adjustment for reverse and forward stock splits, recapitalizations and the like)) to purchase Common Stock issued to underwriters, brokers or finders for payment of reasonable and customary fees in connection with fundraising (debt or equity) activities, including the sale of the Securities; provided, however, that subsections (e) and (f) in this definition are applicable to Section 4.13 of this Agreement and are not applicable to Section 4.14 of this Agreement and (g) with the prior written consent of the Placement Agent, up to an amount of Common Stock and warrants equal to the difference between $3,200,000 and the aggregate Subscription Amounts hereunder, on the same terms and conditions and prices as hereunder, with investors executing definitive agreements for the purchase of such securities and such transactions having closed on or before the earlier of (i) the Filing Date (as defined in the Registration Rights Agreement) or (ii) the date that the Initial Registration Statement (as defined in the Registration Rights Agreement) is actually filed with the Commission.

"Force Majeure" shall mean the following acts or omissions provided that they are beyond the direct control of the Company: an act of God, an act of war, terrorism, natural disaster or prolonged and systematic failure of communication or electrical services. Force Majeure shall not include any act or omission by the Commission or the Trading Market.

"FWS" means Feldman Weinstein & Smith LLP with offices located at 420 Lexington Avenue, Suite 2620, New York, New York 10170-0002.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" shall have the meaning ascribed to such term in Section 3.1(aa).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"Knowledge of the Company", "the Company's Knowledge" and terms and phrases of similar import, whether or not capitalized, means (i) actual knowledge, awareness or belief possessed by Kenneth Brizel, the President and Chief Executive Officer of the Company, and (ii) the knowledge, awareness or belief that Kenneth Brizel would have possessed by using reasonable care and diligence under the circumstances.

Officer of the Company, and (ii) the knowledge, awareness or belief that Kenneth Brizel would have possessed by using reasonable care and diligence under the circumstances.

"Legend Removal Date" shall have the meaning ascribed to such term in Section 4.1(c).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(m).

"Participation Maximum" shall have the meaning ascribed to such term in Section 4.12.

"Per Share Purchase Price" equals $4.00, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Placement Agent" shall mean First Montauk Securities Corp.

"Pre-Notice" shall have the meaning ascribed to such term in Section 4.12.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

~~"Purchaser Party" shall have the meaning ascribed to such term in Section 4.8.~~

"Registration Rights Agreement" means the Registration Rights Agreement, dated the date hereof, among the Company and the Purchasers, in the form of Exhibit A attached hereto.

"Registration Statement" means a registration statement meeting the requirements set forth in the Registration Rights Agreement and covering the resale by the Purchasers of the Shares and the Warrant Shares.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Shares, the Warrants and the Warrant Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" means the shares of Common Stock issued or issuable to each Purchaser pursuant to this Agreement.

"Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means, as to each Purchaser, the aggregate amount to be paid for Shares and Warrants purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount," in United States dollars and in immediately available funds.

"Subsequent Financing" shall have the meaning ascribed to such term in Section 4.12.

"Subsequent Financing Notice" shall have the meaning ascribed to such term in Section 4.12.

"Subsidiary" means any subsidiary of the Company as set forth on Schedule 3.1(a), and shall, where applicable, include any subsidiary of the Company formed or acquired after the date hereof.

"Trading Day" means a day on which the Nasdaq Capital Market is open for trading.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the American Stock Exchange, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board.

"Transaction Documents" means this Agreement, the Warrants, the Escrow Agreement, the Registration Rights Agreement and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Transfer Agent" means Registrar and Transfer Agent Company, the current transfer agent of the Company, with a mailing address of 10 Commerce Drive, Cranford,

5

NJ 07016 and a facsimile number of 908 497-2310, and any successor transfer agent of the Company.

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted for trading as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time); (b) if the Common Stock is not then quoted for trading on the OTC Bulletin Board and if prices for the Common Stock are then reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Purchasers of a majority in interest of the Shares then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable immediately and have a term of exercise equal to 5 years, in the form of Exhibit C attached hereto.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

## ARTICLE II.
## PURCHASE AND SALE

2.1    Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, substantially concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and the Purchasers, severally and not jointly, agree to purchase, up to an aggregate of $3,200,000 of Shares and Warrants. Each Purchaser shall deliver to the Escrow Agent, via wire transfer, immediately available funds equal to its Subscription Amount and the Company shall deliver to each Purchaser its respective Shares and a Warrant as determined pursuant to Section 2.2(a), and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing. Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of FWS or such other location as the parties shall mutually agree.

2.2    Deliveries.

(a)    On or prior to the Closing Date, the Company shall deliver or cause to be delivered to each Purchaser the following:

(i)    this Agreement duly executed by the Company;

6

(ii)    a legal opinion of Company Counsel, substantially in the form of Exhibit B attached hereto;

(iii)    a copy of the irrevocable instructions to the Transfer Agent instructing the Transfer Agent to deliver, on an expedited basis, a certificate evidencing a number of Shares equal to such Purchaser's Subscription Amount divided by the Per Share Purchase Price, registered in the name of such Purchaser;

(iv)    a Warrant registered in the name of such Purchaser to purchase up to a number of shares of Common Stock equal to 30% of such Purchaser's Shares, with an exercise price equal to $5.50, subject to adjustment therein; and

(v)    the Registration Rights Agreement duly executed by the Company.

(b)    On or prior to the Closing Date, each Purchaser shall deliver or cause to be delivered to the Company the following:

(i)    this Agreement duly executed by such Purchaser;

(ii)    such Purchaser's Subscription Amount by wire transfer to the Escrow Agent; and

(iii)    the Registration Rights Agreement duly executed by such Purchaser.

2.3    <u>Closing Conditions</u>.

(a)    The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)    the accuracy in all material respects on the Closing Date of the representations and warranties of the Purchasers contained herein;

(ii)    all obligations, covenants and agreements of each Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)    the delivery by each Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)    The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

(i)    the accuracy in all material respects on the Closing Date of the representations and warranties of the Company contained herein;

(ii)    all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

7

(iii)   the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)   there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)   from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of each Purchaser, makes it impracticable or inadvisable to purchase the Securities at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1   <u>Representations and Warranties of the Company</u>.   Except as set forth in the Disclosure Schedules, which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation or warranty or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules, the Company hereby makes the following representations and warranties to each Purchaser:

(a)   <u>Subsidiaries</u>.   All of the direct and indirect subsidiaries of the Company are set forth on Schedule 3.1(a).  The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.  If the Company has no subsidiaries, then all other references to the Subsidiaries or any of them in the Transaction Documents shall be disregarded.

(b)   <u>Organization and Qualification</u>.   The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.  Neither the Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents.  Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good

8

standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "Material Adverse Effect") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)    Authorization; Enforcement. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, the Board of Directors or the Company's stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)    No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company, the issuance and sale of the Securities and the consummation by the Company of the other transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the

9

Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e) <u>Filings, Consents and Approvals</u>. The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than (i) filings required pursuant to Section 4.4 of this Agreement, (ii) the filing with the Commission of the Registration Statement, (iii) application(s) to each applicable Trading Market for the listing of the Securities for trading thereon in the time and manner required thereby, (iv) the filing of Form D with the Commission and such filings as are required to be made under applicable state securities laws and (v) other consents, waivers, authorizations or orders, or notice to, or filings or registrations with other Persons which have already been obtained, delivered or made as of the date hereof (collectively, the "Required Approvals").

(f) <u>Issuance of the Securities</u>. The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents. The Warrant Shares, when issued in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents. The Company has reserved from its duly authorized capital stock the maximum number of shares of Common Stock issuable pursuant to this Agreement and the Warrants.

(g) <u>Capitalization</u>. The capitalization of the Company is as set forth on Schedule 3.1(g), which Schedule 3.1(g) shall also include the number of shares of ~~Common Stock owned beneficially, and of record, by Affiliates of the Company as of the~~ date hereof. The Company has not issued any capital stock since its most recently filed ~~periodic report under the Exchange Act, other than pursuant to the exercise of employee~~ stock options under the Company's stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plans and pursuant to the conversion or exercise of Common Stock Equivalents outstanding as of the date of the most recently filed periodic report under the Exchange Act. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents other than rights that have been waived. Except as set forth on Schedule 3.1(g) or otherwise disclosed in the SEC Reports or as a result of the purchase and sale of the Securities pursuant to the Transaction Documents, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any

Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h)     SEC Reports; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i)     Material Changes; Undisclosed Events, Liabilities or Developments. Since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in a subsequent SEC Report filed prior to the date hereof, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and

11

accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans and stock purchase plans or as set forth on Schedule 3.1(i). The Company does not have pending before the Commission any request for confidential treatment of information. Except for the issuance of the Securities contemplated by this Agreement, the consummation of the transactions contemplated by the Transaction Documents or as set forth on Schedule 3.1(i), no event, liability or development has occurred or exists with respect to the Company or its Subsidiaries or their respective business, properties, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

(j)     Litigation. Except as set forth on Schedule 3.1(j), there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(k)     Labor Relations. No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company which could reasonably be expected to result in a Material Adverse Effect. None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are generally good. No executive officer, to the knowledge of the Company, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any

12

third party, and, to the knowledge of the Company, the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(l)    Compliance.  Neither the Company nor any Subsidiary (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any order of any court, arbitrator or governmental body, or (iii) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business and all such laws that affect the environment, except in each case as could not have or reasonably be expected to result in a Material Adverse Effect.

(m)    Regulatory Permits.  The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not reasonably be expected to result in a Material Adverse Effect ("Material Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(n)    Title to Assets.  The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them that is material to the ~~business of the Company and the Subsidiaries and good title in all personal property~~ owned by them that is material to the business of the Company and the Subsidiaries, in ~~such case free and clear of all Liens, except for Liens as do not materially affect the value~~ of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in material compliance.

(o)    Patents and Trademarks.  The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or material for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could reasonably be expected to have a Material Adverse Effect (collectively, the

13

"Intellectual Property Rights"). Neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of the Intellectual Property Rights used by the Company or any Subsidiary violates or infringes upon the rights of any Person. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(p)     Insurance. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are reasonably believed by the Company and the Subsidiaries to be prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage at least equal to the aggregate Subscription Amount. Neither the Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(q)     Transactions With Affiliates and Employees. Except as set forth in the SEC Reports, none of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $60,000 other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(r)     Sarbanes-Oxley; Internal Accounting Controls. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 which are applicable to it as of the Closing Date. The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company has established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and designed such disclosure controls and procedures to ensure that information required to be disclosed by

14

the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The Company's certifying officers have evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the Company's most recently filed periodic report under the Exchange Act (such date, the "Evaluation Date"). The Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of the Evaluation Date. Since the Evaluation Date, there have been no changes in the Company's internal control over financial reporting (as such term is defined in the Exchange Act) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(s)    Certain Fees. Except for the fees of the Placement Agent as set forth on Schedule 3.1(s) attached hereto, no brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents. The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(t)    Private Placement. Assuming the accuracy of the Purchasers representations and warranties set forth in Section 3.2, no registration under the Securities Act is required for the offer and sale of the Securities by the Company to the Purchasers as contemplated hereby. The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(u)    Investment Company. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended. The Company shall conduct its business in a manner so that it will not become subject to the Investment Company Act of 1940, as amended.

(v)    Registration Rights. Other than each of the Purchasers, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company other than registrations that are currently effective.

(w)    Listing and Maintenance Requirements. The Common Stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. The Company has not, in the 12 months preceding the date hereof, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that the Company is not in material compliance with the listing or maintenance requirements of such Trading Market. The Company is, and has no reason

to believe that it will not in the foreseeable future continue to be, in material compliance with all such listing and maintenance requirements.

(x)    Application of Takeover Protections.  The Company and the Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's certificate of incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(y)    Disclosure.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information.  The Company understands and confirms that the Purchasers will rely on the foregoing representation in effecting transactions in securities of the Company.  All disclosure furnished by the Company to the Purchasers regarding the Company, its business and the transactions contemplated hereby, including the Disclosure Schedules to this Agreement, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The Company acknowledges and agrees that no Purchaser makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 3.2 hereof.

(z)    No Integrated Offering.  Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its Affiliates, nor, to the Company's knowledge, any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of (i) the Securities Act which would require the registration of any such securities under the Securities Act, or (ii) any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

(aa)   Solvency.  Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business

16

conducted by the Company, and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid. The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date. The SEC Reports set forth as of the date thereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "Indebtedness" means (a) any liabilities for borrowed money or amounts owed in excess of $50,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $50,000 due under leases required to be capitalized in accordance with GAAP. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(bb)   Tax Status.   Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary has filed all necessary federal, state and foreign income and franchise tax returns and has paid or accrued all taxes shown as due thereon, and the Company has no knowledge of a tax deficiency which has been asserted or threatened against the Company or any Subsidiary.

(cc)   No General Solicitation.   Neither the Company nor, to the Company's knowledge, any person acting on behalf of the Company has offered or sold any of the Securities by any form of general solicitation or general advertising. The Company has offered the Securities for sale only to the Purchasers and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

(dd)   Foreign Corrupt Practices.   Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(ee)   Accountants.   The Company's accounting firm is set forth on Schedule 3.1(ee) of the Disclosure Schedule. To the knowledge and belief of the Company, such

17

accounting firm (i) is a registered public accounting firm as required by the Exchange Act and (ii) shall express its opinion with respect to the financial statements to be included in the Company's Annual Report on Form 10-K for the year ending June 30, 2007.

(ff)    No Disagreements with Accountants and Lawyers. There    are    no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company which could affect the Company's ability to perform any of its obligations under any of the Transaction Documents, and the Company is current with respect to any fees owed to its accountants and lawyers.

(gg)    Acknowledgment Regarding Purchasers' Purchase of Securities.    The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby.    The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchasers' purchase of the Securities. The Company further represents to each Purchaser that the Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(hh)    Acknowledgement Regarding Purchaser's Trading Activity. Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Sections 3.2(f) and 4.14 hereof), it is understood and acknowledged by the Company (i) that none of the Purchasers have been asked by the Company to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the ~~Securities for any specified term; (ii) that past or future open market or other transactions~~ by any Purchaser, specifically including, without limitation, Short Sales or "derivative" ~~transactions, before or after the closing of this or future private placement transactions,~~ may negatively impact the market price of the Company's publicly-traded securities; (iii) that any Purchaser, and counter-parties in "derivative" transactions to which any such Purchaser is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iv) that each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (a) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Warrant Shares deliverable with respect to Securities are being determined and (b) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted. The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

18

(ii)    Regulation M Compliance.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

(jj)    Form S-3 Eligibility.  The Company is eligible to register the resale of the Securities for resale by the Purchaser on Form S-3 promulgated under the Securities Act.

3.2    Representations and Warranties of the Purchasers.  Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a)    Organization; Authority.  Such Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate, company or partnership power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of the Transaction Documents and performance by such Purchaser of the transactions contemplated by the Transaction Documents have been duly authorized by all necessary corporate, company, partnership or similar action on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws ~~relating to the availability of specific performance, injunctive relief or other equitable~~ remedies and (iii) insofar as indemnification and contribution provisions may be limited ~~by applicable law.~~

(b)    Own Account.  Such Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws) in violation of the Securities Act or any

applicable state securities law. Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)     Purchaser Status. At the time such Purchaser was offered the Securities, it was, and at the date hereof it is, and on each date on which it exercises any Warrants, it will be either: (i) an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. Such Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d)     Experience of Such Purchaser. Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)     General Solicitation. Such Purchaser is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(f)     Short Sales and Confidentiality Prior To The Date Hereof. Other than consummating the transactions contemplated hereunder, such Purchaser has not, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, directly or indirectly executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing from the time that such Purchaser first received a term sheet (written or oral) from the Company or any other Person representing the Company setting forth the material terms of the transactions contemplated hereunder until the date hereof ("Discussion Time"). Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).

ARTICLE IV.
OTHER AGREEMENTS OF THE PARTIES

4.1     Transfer Restrictions.

(a)    The Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of a Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights of a Purchaser under this Agreement and the Registration Rights Agreement.

(b)    The Purchasers agree to the imprinting, so long as is required by this Section 4.1, of a legend on any of the Securities in the following form:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL ~~INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN~~ RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED ~~BY SUCH SECURITIES.~~

The Company acknowledges and agrees that a Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and the Registration Rights Agreement and, if required under the terms of such arrangement, such Purchaser may transfer pledged or secured Securities to the pledgees or secured parties. Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At the appropriate Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in

connection with a pledge or transfer of the Securities, including, if the Securities are subject to registration pursuant to the Registration Rights Agreement, the preparation and filing of any required prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of Selling Stockholders thereunder.

(c)    Certificates evidencing the Shares and Warrant Shares shall not contain any legend (including the legend set forth in Section 4.1(b)), (i) while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act, or (ii) following any sale of such Shares or Warrant Shares pursuant to and in accordance with Rule 144, or (iii) if such Shares or Warrant Shares are eligible for sale under Rule 144(k), or (iv) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission).  If all or any portion of a Warrant is exercised at a time when there is an effective registration statement to cover the resale of the Warrant Shares, such Warrant Shares shall be issued free of all legends. The Company agrees that following the Effective Date or at such time as such legend is no longer required under this Section 4.1(c), it will, no later than three Trading Days following the delivery by a Purchaser to the Company or the Transfer Agent of a certificate representing Shares or Warrant Shares, as the case may be, issued with a restrictive legend (such third Trading Day, the "Legend Removal Date")(unless a delay is a result of a Force Majeure, provided that the Company continues to use commercially reasonable efforts to ultimately perform its obligations hereunder), deliver or cause to be delivered to such Purchaser a certificate representing such shares that is free from all restrictive and other legends. The Company may not make any notation on its records or give instructions to the Transfer Agent that enlarge the restrictions on transfer set forth in this Section. Certificates for Securities subject to legend removal hereunder shall be transmitted by the Transfer Agent to the Purchaser by crediting the account of the Purchaser's prime broker with the Depository Trust Company System as directed by such Purchaser.

(d)    ~~In addition to such Purchaser's other available remedies, the Company~~ shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, for ~~each $1,000 of Shares or Warrant Shares (based on the VWAP of the Common Stock on~~ the date such Securities are submitted to the Transfer Agent) delivered for removal of the restrictive legend and subject to Section 4.1(c), $5 per Trading Day (increasing to $10 per Trading Day five (5) Trading Days after such damages have begun to accrue) for each Trading Day after the fourth Trading Day after the Legend Removal Date until such certificate is delivered without a legend. Nothing herein shall limit such Purchaser's right to pursue actual damages for the Company's failure to deliver certificates representing any Securities as required by the Transaction Documents, and such Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

(e)    Each Purchaser, severally and not jointly with the other Purchasers, agrees that such Purchaser will sell any Securities pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery

requirements, or an exemption therefrom, and that if Securities are sold pursuant to a Registration Statement, they will be sold in compliance with the plan of distribution set forth therein, and acknowledges that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 4.1 is predicated upon the Company's reliance upon this understanding.

4.2    Furnishing of Information.    So long as any Purchaser owns Securities, the Company covenants to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act. As long as any Purchaser owns Securities, if the Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to the Purchasers upon request and make publicly available in accordance with Rule 144(c) such information as is required for the Purchasers to sell the Securities under Rule 144, except the foregoing shall not be required if there is then on file with the Commission a then currently effective Registration Statement covering such Securities. The Company further covenants that it will take such further action as any holder of Securities may reasonably request, to the extent required from time to time to enable such Person to sell such Securities without registration under the Securities Act within the requirements of the exemption provided by Rule 144.

4.3    Integration.    The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities to the Purchasers or that would be integrated with the offer or sale of the Securities to the Purchasers for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

4.4    Securities Laws Disclosure; Publicity.    The Company shall (1) by 8:30 a.m. (New York City time) on the Trading Day immediately following the date hereof, issue a press release, disclosing the material terms of the transactions contemplated hereby, and (2) by 5:00 p.m. (New York City time) on the Trading Day immediately following the date hereof, file a Current Report on Form 8-K with the Commission disclosing the material terms of the transactions contemplated hereby, and attaching the Transaction Documents as exhibits thereto. The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release or otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (i) as required by federal securities law in connection with (A) any registration statement contemplated by the Registration Rights Agreement and (B) the filing

of final Transaction Documents (including signature pages thereto) with the Commission and (ii) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under this clause (ii).

4.5     Shareholder Rights Plan.  No claim will be made or enforced by the Company or, with the consent of the Company, any other Person, that any Purchaser is an "Acquiring Person" under any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or similar anti-takeover plan or arrangement in effect or hereafter adopted by the Company, or that any Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents or under any other agreement between the Company and the Purchasers.

4.6     Non-Public Information.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality and use of such information.  The Company understands and confirms that each Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company.

4.7     Use of Proceeds.  Except as set forth on Schedule 4.7 attached hereto, the Company shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and shall not use such proceeds for (a) the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) the redemption of any Common Stock or Common Stock Equivalents or (c) the settlement of any outstanding litigation.

4.8     Indemnification of Purchasers.  Subject to the provisions of this Section 4.8, the Company will indemnify and hold each Purchaser and its directors, officers, shareholders, ~~members, partners, employees and agents (and any other Persons with a functionally equivalent~~ role of a Person holding such titles notwithstanding a lack of such title or any other title), each ~~Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and~~ Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents.  If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party.  Any Purchaser Party shall have the right to employ separate counsel in any such action

and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company will not be liable to any Purchaser Party under this Agreement (i) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents, or the wrongful or negligent acts or omissions of such Purchaser Party.

4.9     Reservation of Common Stock. As of the date hereof, the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock for the purpose of enabling the Company to issue Shares pursuant to this Agreement and Warrant Shares pursuant to any exercise of the Warrants.

4.10     Listing of Common Stock. The Company hereby agrees to use commercially reasonable efforts to maintain the listing of the Common Stock on a Trading Market, and as soon as reasonably practicable following the Closing (but not later than the earlier of the Effective Date and the first anniversary of the Closing Date) to list all of the Shares and Warrant Shares on such Trading Market. The Company further agrees, if the Company applies to have the Common Stock traded on any other Trading Market, it will include in such application all of the Shares and Warrant Shares, and will take such other action as is necessary to cause all of the Shares and Warrant Shares to be listed on such other Trading Market as promptly as reasonably possible. The Company will take all action reasonably necessary to continue the listing and trading of its Common Stock on a Trading Market and will comply in all material respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

4.11     Equal Treatment of Purchasers. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents. For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to not treat the Purchasers as a class or group and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

4.12     Participation in Future Financing.

(a)     From the date hereof until the date that is the 12-month anniversary of the Effective Date, upon any issuance by the Company or any of its Subsidiaries of Common

Stock or Common Stock Equivalents for cash consideration (a "Subsequent Financing"), each Purchaser shall have the right to participate in the Subsequent Financing up to an amount equal to 50% of the Subsequent Financing (the "Participation Maximum") on the same terms, conditions and price provided for in the Subsequent Financing, subject to the limitation set forth in this Section 4.13.

(b)    At least 5 Trading Days prior to the closing of the Subsequent Financing, the Company shall deliver to each Purchaser a written notice of its intention to effect a Subsequent Financing ("Pre-Notice"), which Pre-Notice shall ask such Purchaser if it wants to review the details of such financing (such additional notice, a "Subsequent Financing Notice"). Upon the request of a Purchaser, and only upon a request by such Purchaser, for a Subsequent Financing Notice, the Company shall promptly, but no later than 1 Trading Day after such request, deliver a Subsequent Financing Notice to such Purchaser. The Subsequent Financing Notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised thereunder and the Person or Persons through or with whom such Subsequent Financing is proposed to be effected and shall include a term sheet or similar document relating thereto as an attachment.

(c)    Any Purchaser desiring to participate in such Subsequent Financing must provide written notice to the Company by not later than 5:30 p.m. (New York City time) on the 5th Trading Day after the Pre-Notice is deemed given pursuant to Section 5.4 below that the Purchaser is willing to participate in the Subsequent Financing, the amount of the Purchaser's participation, and that the Purchaser has such funds ready, willing, and available for investment on the terms set forth in the Subsequent Financing Notice. If the Company receives no notice from a Purchaser as of such 5th Trading Day, such Purchaser shall be deemed to have notified the Company that it does not elect to participate.

(d)    If by 5:30 p.m. (New York City time) on the 5th Trading Day after all of the Purchasers have received the Pre-Notice, notifications by the Purchasers of their willingness to participate in the Subsequent Financing (or to cause their designees to ~~participate) is, in the aggregate, less than the total amount of the Subsequent Financing,~~ then the Company may effect the remaining portion of such Subsequent Financing on the ~~terms and with the Persons set forth in the Subsequent Financing Notice.~~

(e)    If by 5:30 p.m. (New York City time) on the 5th Trading Day after all of the Purchasers have received the Pre-Notice, the Company receives responses to a Subsequent Financing Notice from Purchasers seeking to purchase more than the aggregate amount of the Participation Maximum, each such Purchaser shall have the right to purchase its Pro Rata Portion (as defined below) of the Participation Maximum. "Pro Rata Portion" means the ratio of (x) the Subscription Amount of Securities purchased on the Closing Date by a Purchaser participating under this Section 4.12 and (y) the sum of the aggregate Subscription Amounts of Securities purchased on the Closing Date by all Purchasers participating under this Section 4.12 plus the aggregate subscription amounts of investors party to securities purchase agreement(s) contemplated by clause (g) in the definition of Exempt Issuance that are participating in such Subsequent Financing

pursuant to participation rights granted to such investors under such agreements that are substantially similar to this Section 4.12.

(f)    The Company must provide the Purchasers with a second Subsequent Financing Notice, and the Purchasers will again have the right of participation set forth above in this Section 4.12, if the Subsequent Financing subject to the initial Subsequent Financing Notice is not consummated for any reason on the terms set forth in such Subsequent Financing Notice within 60 Trading Days after the date of the initial Subsequent Financing Notice.

(g)    Notwithstanding the foregoing, this Section 4.12 shall not apply in respect of (i) an Exempt Issuance or (ii) an underwritten public offering of Common Stock.

(h)    The Company shall not effect any exercise of the right to participate in a Subsequent Financing pursuant to this Section 4.12, and a Purchaser shall not have the right to exercise the right to participate in a Subsequent Financing pursuant to this Section 4.12, to the extent that after giving effect to any issuance of Common Stock or Common Stock Equivalents after such exercise, such Purchaser (together with such Purchaser's Affiliates and any person or entity acting as a group together with such Purchaser or any of such Purchaser's Affiliates) would beneficially own in excess of the Beneficial Ownership Limitation (as defined below).  For purposes of this Section 4.12(h), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being by such Purchaser that the Company is not representing to such Purchaser that such calculation is in compliance with Schedule 13(d) of the Exchange Act and such Purchaser is solely responsible for any schedules required to be filed in accordance therewith.  To the extent the limitation in this Section 4.12(h) applies, the determination whether this right to participate in a Subsequent Financing is exercisable (in relation to other securities owned by such Purchaser together with any Affiliates) and of which portion of this right to participate is exercisable shall be in the sole discretion of such Purchaser and the submission of a notice to participate shall be deemed to be such Purchaser's determination of whether this right to participate is exercisable (in relation to other securities owned by such Purchaser together with any Affiliates) and of which portion of this right to participate is exercisable, in each case subject to such aggregate percentage limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination.  In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.  For purposes of this Section 4.12(h), in determining the number of outstanding shares of Common Stock, a Purchaser may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-Q or Form 10-K, as the case may be, (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Company's Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Purchaser, the Company shall within two Trading Days confirm orally and in writing to such Purchaser the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of

27

any securities of the Company by such Purchaser or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of the right to participate in a Subsequent Financing. The Beneficial Ownership Limitation may not be waived by such Purchaser. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 4.12(h) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of this right to participate in a Subsequent Financing.

4.13    Subsequent Equity Sales.

(a) From the date hereof until 90 days after the Effective Date, neither the Company nor any Subsidiary shall issue shares of Common Stock or Common Stock Equivalents; provided, however, the 90 day period set forth in this Section 4.13 shall be extended for the number of Trading Days during such period in which (i) trading in the Common Stock is suspended by any Trading Market, or (ii) following the Effective Date, the Registration Statement is not effective or the prospectus included in the Registration Statement may not be used by the Purchasers for the resale of the Shares and Warrant Shares.

(b) From the date hereof until the earlier of (i) such time as no Purchaser holds any of the Securities and (ii) two years from the date hereof, the Company shall be prohibited from effecting or entering into an agreement to effect any Subsequent Financing involving a Variable Rate Transaction. "Variable Rate Transaction" means a transaction in which the Company issues or sells (i) any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive ~~additional shares of Common Stock either (A) at a conversion, exercise or exchange rate~~ or other price that is based upon and/or varies with the trading prices of or quotations for ~~the shares of Common Stock at any time after the initial issuance of such debt or equity~~ securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into any agreement, including, but not limited to, an equity line of credit, whereby the Company may sell securities at a future determined price. Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages.

(c) Notwithstanding the foregoing, this Section 4.13 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction shall be an Exempt Issuance.

4.14    Short Sales and Confidentiality After The Date Hereof. Each Purchaser, severally and not jointly with the other Purchasers, covenants that neither it nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period commencing at the Discussion Time and ending at the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.4. Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company as described in Section 4.4, such Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Disclosure Schedules. Each Purchaser severally and not jointly with any other Purchaser, understands and acknowledges, and agrees to act in a manner that will not violate, the positions of the Commission as set forth in Item 65, Section A, of the Manual of Publicly Available Telephone Interpretations, dated July 1997, compiled by the Office of Chief Counsel, Division of Corporation Finance. Notwithstanding the foregoing, no Purchaser makes any representation, warranty or covenant hereby that it will not engage in Short Sales in the securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.4; except that, until the expiration of the 6 month period immediately following the date hereof, such Purchaser severally and not jointly with the other Purchasers, covenants that neither it nor any Affiliate acting on its behalf or pursuant to any understanding with it, shall knowingly engage in any Short Sales, except on those days (each a "Permitted Day") on which the aggregate short position with respect to the Common Stock of such Purchaser prior to giving effect to any Short Sales by such Purchaser on such Permitted Day does not exceed such Purchaser's Permitted Share Position (as defined below) on such Permitted Day; provided, however, that a Purchaser will only be entitled to engage in transactions that constitute Short Sales on a Permitted Day to the extent that following such transaction, the aggregate short position with respect to the Common Stock of such Purchaser does not exceed such Purchaser's Permitted Share Position. For purposes of this Section 4.14, a Purchaser's "Permitted Share Position" means, with respect to any date of determination, the number of shares of Common Stock owned by such Purchaser (including Shares, Warrant Shares and shares purchased in the open market, prior transactions with the Company or otherwise) plus the maximum number of shares of Common Stock that such Purchaser has a right to convert or exercise into pursuant to any outstanding securities of the Company (whether or not exercised or converted and without regard to any exercise caps or other exercise restrictions applicable to the Warrants) held by such Purchaser. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

4.15    Delivery of Securities After Closing. The Company shall deliver, or cause to be delivered, the respective Securities purchased by each Purchaser to such Purchaser within 3 Trading Days of the Closing Date.

4.16    Form D; Blue Sky Filings. The Company agrees to timely file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof, promptly

upon request of any Purchaser. The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchasers at the Closing under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of such actions promptly upon request of any Purchaser.

4.17   Capital Changes.   Until the one year anniversary of the Effective Date, the Company shall not undertake a reverse or forward stock split or reclassification of the Common Stock without the prior written consent of the Purchasers holding a majority in interest of the Shares.

## ARTICLE V.
## MISCELLANEOUS

5.1   Termination.   This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing has not been consummated on or before July 31, 2007; provided, however, that no such termination will affect the right of any party to sue for any breach by the other party (or parties).

5.2   Fees and Expenses.   Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all Transfer Agent fees, stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

5.3   Entire Agreement.   The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4   Notices.   Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (c) the 2nd Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto, except as the same may be changed by a party hereto by delivering notice to the Purchasers, in the case of a change of address by the Company, and to the Company, in the case of a change of address by any Purchaser, in each case in accordance with the terms hereof, such change of address to be

effective on the later of the date set forth in such notice, or ten (10) days after such notice is deemed given hereunder.

5.5    Amendments; Waivers.    No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchasers of at least 67% of the Shares still held by the Purchasers or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

5.6    Headings.    The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

5.7    Successors and Assigns.    This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger). Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchasers" and until the 6 month anniversary of the date hereof any such assignment shall require the consent of the Company, which shall not be unreasonably withheld.

5.8    No Third-Party Beneficiaries.    This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.8.

5.9    Governing Law.    All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to

such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

    5.10    Survival. The representations and warranties contained herein shall survive the Closing and the delivery of the Shares and Warrant Shares.

    5.11    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

    5.12    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

    5.13    Rescission and Withdrawal Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights; provided, however, in the case of a rescission of an exercise of a Warrant, the Purchaser shall be required to return any shares of Common Stock delivered in connection with any such rescinded exercise notice.

    5.14    Replacement of Securities. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and the execution of an indemnification agreement related thereto in form and substance reasonably acceptable to the

Company. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

5.15   Remedies.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents.  The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agrees to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.16   Payment Set Aside.  To the extent that the Company makes a payment or payments to any Purchaser pursuant to any Transaction Document or a Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.17   Independent Nature of Purchasers' Obligations and Rights.  The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose.  Each Purchaser has been represented by its own separate legal counsel in their review and negotiation of the Transaction Documents.  For reasons of administrative convenience only, Purchasers and their respective counsel have chosen to communicate with the Company through FWS.  FWS does not represent all of the Purchasers but only the Placement Agent.  The Company has elected to provide all Purchasers with the same terms and Transaction Documents for the convenience of the Company and not because it was required or requested to do so by the Purchasers.

5.18   Liquidated Damages.  The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to

33

which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.19   Saturdays, Sundays, Holidays, etc.   If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

5.20   Construction. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto.

5.21   **WAIVER OF JURY TRIAL. IN ANY ACTION, SUIT OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

*(Signature Pages Follow)*

34

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**LIGHTPATH TECHNOLOGIES, INC.**

By: _____

Name: Kenneth Brizel
Title: Chief Executive Officer

<u>Address for Notice:</u>

**2603 Challenger Tech Court,
Suite 100
Orlando, FL 32826**

With a copy to (which shall not constitute notice):

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

[PURCHASER SIGNATURE PAGES TO [14th SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _____

Signature of Authorized Signatory of Purchaser: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Email Address of Purchaser: _____

Fax Number of Purchaser: _____

Address for Notice of Purchaser:

_____

_____

Address for Delivery of Securities for Purchaser (if not same as address for notice):

_____

Subscription Amount: $ _____

Shares: _____

Warrant Shares: _____

EIN Number: _____

[SIGNATURE PAGES CONTINUE]

# EXHIBIT 2

| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP75 11 | MWRevancOma | 20-Sep-2007 16:03 EST | | 78064 TX 1 | 1* |
|---|---|---|---|---|---|---|---|
| FORM 8-K | | | TAM | | | HTM IFV | 0C |
| | | | | | | Page 1 of 1 | |

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

September 18, 2007
Date of Report (Date of earliest event reported)

---

# LIGHTPATH TECHNOLOGIES, INC.

(Exact name of registrant as specified in its charter)

---

| **Delaware** | **000-27548** | **86-0708398** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

2603 Challenger Tech Court, Suite 100
Orlando, Florida 32826
(Address of principal executive office, including zip code)

(407) 382-4003
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))



| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP29 11 | MWRevanc0ma | 20-Sep-2007 16:03 EST | 78064 TX 2 | 1* |
| FORM 8-K | | | TAM | | HTM IFV | 0C |
|  |  |  |  |  | Page 1 of 1 |  |

LightPath Technologies, Inc.
Form 8-K

**Item 5.02.  Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

(b) Effective as of September 18, 2007, Mr. Kenneth Brizel's employment with LightPath Technologies, Inc. (the "Company") terminated. Mr. Brizel was the President and Chief Executive Officer. On such date, Mr. Brizel resigned as a director of the Company's and its Shanghai subsidiary. As of September 18, 2007 Mr. Brizel's employment agreement with the Company was amended to stipulate that his employment had been terminated by the Company other than for "Cause" and, accordingly, Mr. Brizel will be entitled to receive severance in the amount of $286,000 to be paid over the next year pursuant to the terms of his employment agreement. The amendment to the employment agreement is attached as Exhibit 99.2 to this Current Report.

(c) On September 18, 2007, Mr. James Gaynor, the Company's Senior Vice President of Global Operations, was appointed as Interim Chief Executive Officer by the Company's Board of Directors as announced in the Company's press release attached as Exhibit 99.1 to this Current Report.

Mr. Gaynor was Senior Vice President of Global Operations since July 2006. Mr. Gaynor is a mechanical engineer with 25 years of business and manufacturing experience in volume component manufacturing in electronics and optics industries. Prior to joining LightPath from August 2002 to July 2006, Mr. Gaynor was Director of Operations and Manufacturing for Puradyn Filter Technologies. Previous to that he was Vice president of Operations and General Manager for JDS Uniphase Corporation's Transmission Systems Division from March 2000 to April 2002. He has also held executive positions with Spectrum Control, Rockwell International and Corning Glass Works. His experience includes various engineering, manufacturing and management positions in specialty glass, electronics, telecommunications components and mechanical assembly operations. His global business experience encompasses strategic planning, budgets, capital investment, employee development, cost reduction, acquisitions and business start-up and turnaround success. Mr. Gaynor holds a Bachelors of Science degree in Mechanical Engineering from the Georgia Institute of Technology and has worked in manufacturing industries since 1976.

**Item 9.01.  Financial Statements and Exhibits**

(d)  Exhibits

Exhibit 99.1    Press Release on September 19, 2007 (furnished herewith).

Exhibit 99.2    First Amendment to Employment Agreement dated as of September 18, 2007, between Kenneth Brizel and LightPath Technologies, Inc.

2



| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP78 5.8 | MWRevanc0ma | 20-Sep-2007 16:03 EST | 78064 TX 3 | 1* |
| FORM 8-K | | | TAM | | HTM IFV | 0C |
| | | | | | Page 1 of 1 | |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this Report to be signed in its behalf by the undersigned, thereunto duly authorized.

LIGHTPATH TECHNOLOGIES, INC.

Dated: September 20, 2007

By: /s/ Dorothy M. Cipolla
Dorothy M. Cipolla, CFO

3



| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP29 9.8 | MWRevancOma | 20-Sep-2007 16:03 EST | 78064 TX 4 | 1* |
|---|---|---|---|---|---|---|
| FORM 8-K | | | TAM | | HTM IFV | 0C |
| | | | | | Page 1 of 1 | |

## Exhibit Index

| Exhibit No. | Description |
|---|---|
| EX-99.1 | Press Release issued on September 19, 2007. |
| EX-99.2 | First Amendment to Employment Agreement dated as of September 18, 2007, between Kenneth Brizel and LightPath Technologies, Inc. |

4

| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP79 | MWRevancOma | 20-Sep-2007 16:03 EST | 78064 EX99_1 1   1* |
| FORM 8-K | | | TAM | | HTM IFV   0C |

Exhibit 99.1

### LightPath Technologies, Inc., Releases Preliminary Q4 2007 Results
### Announces Search for New CEO

ORLANDO, FL — 09/19/2007 — LightPath Technologies, Inc. (NASDAQ: LPTH), manufacturer and integrator of families of precision molded aspheric optics, precision molded infrared optics, GRADIUM® glass products, and high-performance fiber-optic collimators and isolators, reported today that projected results for its fourth quarter of fiscal 2007 include sales of approximately $2.2 million compared with $3.4 million in the fourth quarter of fiscal 2006, a decrease of 33%. Fiscal year 2007 sales increased 10%, to $13.4 million compared to fiscal 2006 when the Company reported sales of approximately $12.2 million. The increase for the year was primarily attributable to increases in aspheric lenses offset by decreases in products sold to the telecommunications industry. Starting in the second quarter of fiscal 2007, new orders from our telecommunications customers slowed down realizing lower revenues in the fourth quarter of fiscal 2007.

At June 30, 2007, our Disclosure Backlog (as defined in our Annual Report on Form 10K for June 30, 2006) was $1.8 million, a decrease of 57% over our Disclosure Backlog at June 30, 2006 of $4.3 million. Comparing fiscal 2007 to fiscal 2006 our backlog at the end of fiscal 2006 was higher in products to the telecommunications industry, due to an increase in orders and higher than normal delinquent delivery rate. Due to market conditions, throughout fiscal 2007 new orders from the telecommunications industry were lower. We believe the downward trend in the Disclosure Backlog was principally caused by a slow down in telecommunications orders in the second, third and fourth quarters of fiscal year 2007.

The impact of the revenue decline in the fourth quarter of 2007 was due to much lower communications sales due to market conditions and about $362,000 of late shipments due to manufacturing operational issues, we expect these late shipments to be shipped by the end of September 2007. Cash used in the fourth quarter of fiscal 2007 was significantly higher than the cash used in the fourth quarter of 2006. The fourth quarter included one time charges of $341,000 due to glass yield issues, overtime for direct labor, travel for engineering and management to resolve issues, and freight and duty expenses. The cash balance as of June 30, 2007 was $1.3 million. This balance does not include the recent July 2007 equity raise of $3.2 million.

Ms. Dorothy Cipolla, CFO, stated, "To offset the poor financial performance in the fourth quarter, over the last few months the company has reduced the workforce in Orlando by 25 staff, bringing the headcount to 88. This should provide a reduction in our payroll costs of about $0.9 million during fiscal 2008. As more of the production is shifting to Shanghai, the Orlando facility needs to be right-sized. All areas of expense are being evaluated for cost savings with the intent to bring the company to profitability. The Orlando facility has twice as much space as is needed and costs approximately $1.0 million per year. Over the next few months, we will be evaluating other locations, as our lease expires in November 2008. We are also working with our current landlord and others to secure appropriate and affordable lease terms."

Also, LightPath has announced that effective September 18, 2007, its Chief Executive Officer, Kenneth Brizel, will no longer be employed by the company. The company has engaged an



| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP79 ss | MWrevanc0ma | 20-Sep-2007 16:03 EST | 78064 EX99_1 2 | 1* |
| FORM 8-K | | | TAM | | HTM IFV | 0C |
| | | | | | Page 1 of 1 | |

Executive Search firm to conduct a search for a new CEO; it will include LightPath executives as well as outside candidates. Jim Gaynor, currently Senior V.P. Global Operations, has been appointed interim CEO. While Ken Brizel helped LightPath achieve many successes, including the creation of new markets for the company's technologies and establishing a manufacturing presence in China, Mr. Brizel and LightPath have determined that it is mutually beneficial to make this change. LightPath wishes Ken well in his future endeavors.

Mr. Robert Ripp, Chairman of LightPath, commented, "We remain very committed to our strategy of being a diversified supplier of passive optical components; as well as being the lowest cost producer of those components. Our goal is to improve the execution of our strategy. The new CEO will need to have the leadership skills to manage the company to a sustainable level of profitability and positive cash flows by introducing exciting new opportunities that will accelerate our revenue growth, and to increase profit margins by continuing to pursue cost reductions initiatives."

Mr. Ripp continued, "The priorities of qualities and experiences that we seek in our prospective CEO are: a track record of execution/operational success, a familiarity in managing China operations, new product development background, and a set of relationships within the optical space that can benefit LightPath with its suppliers and customers."

**Webcast Details:**

LightPath plans to release the final fiscal 2007 numbers on September 28, 2007. The company plans to hold an audio webcast at 3:00 p.m. EDT on Friday, September 28, 2007, to discuss details regarding the company's performance for the fourth quarter and fiscal year 2007. The session may be accessed at www.lightpath.com. A transcript archive of the webcast will be available for viewing or download on our web site shortly after the call is concluded.

LightPath manufactures optical products including precision molded aspheric optics, precision molded infrared optics, GRADIUM® glass products, proprietary collimator assemblies, isolators utilizing proprietary automation technology, higher-level assemblies and packing solutions. LightPath has a strong patent portfolio that has been granted or licensed to us in these fields. LightPath common stock trades on the NASDAQ Capital Market under the symbol "LPTH." Investors are encouraged to go to LightPath's website for additional financial information.

This news release includes statements that constitute forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. This information may involve risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, factors detailed by LightPath Technologies, Inc. in its public filings with the Securities and Exchange Commission.

Contacts:
Dorothy Cipolla, CFO
LightPath Technologies, Inc.
(407) 382-4003
Internet: www.lightpath.com

| LIGHTPATH TECHNOLOGI | RR Donnelley ProFile | ACWIN-CTXP79 9.8 | MWRevanc0ma | 20-Sep-2007 16:03 EST | 78064 EX99_2 1 | 1* |
| FORM 8-K | | | TAM | | HTM IFV | 0C |

Exhibit 99.2

## FIRST AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT

THIS FIRST AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT (the "Amendment") is effective as of September 18, 2007, by and between **LIGHTPATH TECHNOLOGIES, INC.**, a Delaware corporation ("LightPath"), and **KENNETH BRIZEL** (THE "Executive") .

### WITNESSETH:

WHEREAS, LightPath and the Executive entered into that certain Executive Employment Agreement dated as of February 13, 2007 (the "Original Agreement"); and

WHEREAS, the parties desire to amend the Original Agreement as provided hereinbelow.

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Recitals. The above recitals are true and correct and incorporated herein by reference.

2. Capitalized Terms. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Original Agreement.

3. Amendment to Original Agreement. LightPath and the Executive agree that the Executive's employment has been terminated by LightPath other than for "Cause" and, accordingly, the Executive shall be entitled to receive the Severance Payment in accordance with Section 9 of the Original Agreement.

4. Ratification of Original Agreement. The parties hereby ratify all other terms and conditions of the Original Agreement, Specifically, the Execute acknowledges that notwithstanding the termination of his employment with LightPath, he continues to be bound by and subject to the provisions of the Original Agreement set forth under Sections 5, 6, and 7 thereof.

4. Miscellaneous. This Amendment may be executed and delivered in counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. A facsimile copy of this Amendment and any signature thereon shall be considered for all purposes an original. Except as expressly amended hereby, the Original Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment to Executive Employment Agreement effective as of the date first above written.

"LightPath"

LIGHTPATH TECHNOLOGIES, INC.

By: /s/ Robert Ripp
   Robert Ripp, Chairman

"Executive"

/s/ Kenneth Brizel
Kenneth Brizel

# EXHIBIT 3

8-K 1 lightpath8k.htm LIGHTPATH 8K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934.**

**Date of Report: October 01, 2007**
(Date of earliest event reported)

**LightPath Technologies Inc.**
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **FL** | **000-27548** | **86-0708398** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| | |
|---|---|
| **2603 Challenger Tech CT #100** | **32826** |
| (Address of principal executive offices) | (Zip Code) |

**407-382-4003**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former Name or Former Address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

## Item 2.02. Results of Operations and Financial Condition

The Registrant issued a Press Release on October 1, 2007, reporting fourth quarter and results for the

fiscal year ended June 30, 2007. A copy of the Press Release is attached as Exhibit 99.1 to this Report.

**Item 9.01. Financial Statements and Exhibits**

**(a) Financial statements:**
   None
**(b) Pro forma financial information:**
   None
**(c) Shell company transactions:**
   None
**(d) Exhibits**
   99.1    Press Release of LightPath Technologies Inc. dated October 01, 2007

---

**SIGNATURE**

   Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: October 01, 2007                **LIGHTPATH TECHNOLOGIES INC.**

                                        By:  /s/ Dorothy M Cipolla
                                        Dorothy M Cipolla
                                        *Chief Financial Officer*

---

**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release of LightPath Technologies Inc. dated October 01, 2007 |

EX-99 2 lightpathtechnologi.htm LIGHTPATH PRESS RELEASE

**LightPath Technologies, Inc. Announces Fiscal 2007 Financial Results**

ORLANDO, FL -- 10/01/2007 -- LightPath Technologies, Inc. (NASDAQ: LPTH), manufacturer and integrator of families of precision molded aspheric optics, GRADIUM® glass products, and high-performance fiber-optic collimators and isolators, today announced audited financial results for the fourth quarter and fiscal year ending June 30, 2007.

Summary (see Quick Reference and Financial Tables below)

Fiscal 2007: Our total year financial results compared to fiscal 2006 -

```
--  Revenues for fiscal year 2007 increased 10%, or $1.2 million

--  Gross margin increased by $993,000

--  Gross margin percentage increased from 17% in 2006 to 23% in 2007

--  Operating and other costs below the gross profit line increased by
    $199,000 from 2006 to 2007

--  These factors combined to contribute to lower net loss per share of
    $(0.58) vs. $(0.86) and an increase in total cash used from $2.28 million
    in 2006 to $2.47 million in 2007, excluding the $3.6 million of cash
    received from the private placement of common stock in fiscal 2006.
```

Fourth Quarter 2007: Our net loss and cash flow have increased on lower revenue in our fourth quarter compared to 2006 -

```
--  Revenues for the fourth quarter decreased 33%, or $1.1 million

--  Gross margin decreased by approximately $398,000, the fourth quarter
    included one time charges of $341,000 due to glass yield issues, overtime
    for direct labor, travel for engineering and management to resolve issues,
    and freight and duty expenses

--  Gross margin percentage decreased to 2% of sales from 13% of sales in
    the prior year's fourth quarter

--  Operating and other costs below the gross margin line increased by
    $29,000 from the prior year to the current year fourth quarter

--  These factors combined to contribute to a higher net loss of $1.3
    million or $(0.29) per share vs. $825,000 or $(0.18) per share in the
    fourth quarter of 2006 and a decline in cash flow from operations when
    compared to the same period last year (see below).
```

```
Quick Reference (unaudited):

In millions, except earnings per share data
```

|  | Three months ended | Year ended |
|---|---|---|

|  | June 30, | | June 30, | |
|  | 2007 | 2006 | 2007 | 2006 |
| Revenues | $   2.28 | $   3.41 | $  13.35 | $  12.17 |
| Gross Profit | $   0.05 | $   0.45 | $   3.05 | $   2.05 |
| Net Loss | $  (1.30) | $  (0.83) | $  (2.61) | $  (3.37) |
| Loss per share | $  (0.29) | $  (0.18) | $  (0.58) | $  (0.86) |
| Cash provided by (used by) operations | $   (418) | $     74 | $  (1,857) | $  (1,987) |

|  | June 30, | March 31, | June 30, |
|  | 2007 | 2007 | 2006 |
| Cash and cash equivalents | $   1.29 | $   1.88 | $   3.76 |

Discussion:

Fiscal Year Ended 2007:

For the fiscal year ended June 30, 2007, we reported total revenues of $13.35 million compared to $12.17 million for the previous fiscal year, an increase of 10%. Net loss for fiscal 2007 was $2.61 million, or $0.58 per share. For fiscal 2006, we reported a net loss of $3.37 million, or $0.86 per share.

The revenue increase for the year was primarily attributable to increases in sales of aspheric lenses which was partially offset by decreases in products sold to the telecommunications industry.

Gross margin for the full fiscal year 2007 was $3.05 million (gross margin percentage of 23%) vs. gross margin from the prior fiscal year of $2.05 million (gross margin percentage of 17%). The primary reason for these improved gross margins is the increased production at our China manufacturing facility. The China facility contributed more than 75% of the production of molded optics in the fourth quarter of fiscal 2007.

Fourth Quarter 2007:

For the quarter ended June 30, 2007, we reported total revenues of $2.28 million compared to $3.41 million for the 2006 fourth quarter, a decrease of 33%. Net loss for the quarter was $1.30 million, or $0.29 per share, compared to a net loss of $0.83 million, or $0.18 per share. Starting in the second quarter of fiscal 2007, new orders from our telecommunications customers slowed down resulting in lower revenues in the fourth quarter of fiscal 2007. Gross margin decreased in the fourth quarter vs. the same period last year. Gross margin for the quarter ended June 30, 2007 was approximately $51,000, or 2% vs. $449,000, or 13% as compared to the prior year fourth quarter. The decrease in gross margin in the fourth quarter of fiscal 2007 was mainly attributable to the decreased revenue, and $341,000 of one time expense relating to production issues at our China facility.

Other business expenses were generally the same contributing to an increase in our net loss to $1.30 million for the fourth quarter of 2007 compared to a net loss of $0.83 million in the fourth quarter of 2006.

Cash Status:

For the quarter ended June 30, 2007, net cash decreased by $0.59 million, compared to an increase of $25,000 in the fourth quarter of 2006. For the fiscal year of 2007, cash used was $2.47 million. In

contrast, fiscal 2006 net cash used was $2.28 million, excluding the third quarter cash inflows from a private placement of common stock ($3.58 million). Our cash usage increase reflects the lower revenue levels in the second half of the fiscal years and our inability to decrease fixed costs in line with the revenue decline.

CEO's Comments:

Jim Gaynor, Interim CEO of LightPath, stated, "In Q4 we experienced some extraordinary and isolated operational issues, which negatively impacted our gross margin by $341,000 or 15 percentage points of gross margin.

These one time charges were attributed to glass yield issues, increased direct labor, inventory adjustment associated with the China operation startup and travel for engineering to train operators and upgrade molding equipment to accept the new RoHS compliant glass system.

As part of our strategy to diversify our served markets and position the company to be able to participate in lower cost, higher volume opportunities, we have continued to expand our China manufacturing capability. Our China facility is now producing 75% of our aspheric production volume and 85% of our manufactured preforms.

In addition, we have just completed upgrading all of the existing press stations to the new computerized atmospheric controlled press in Orlando and China. This change allows us to fully implement the RoHS compliant glass systems and also allows us the flexibility to take advantage of other lower cost glass materials in support of our strategy.

We will continue to leverage our Shanghai facility with the transfer of our isolator product line from our Orlando facility to our China facility over the next few months.

As a result of the management actions taken, we are seeing positive results in yield improvement, production rates and cost reductions.

While we are not satisfied with the financial performance of the fourth quarter, we have made significant progress in diversifying our markets, reducing costs and positioning LightPath to participate in higher volume market opportunities."

Additional information concerning the Company and its products can be found at the Company's web site at www.lightpath.com.

About LightPath:

LightPath manufactures optical products including precision molded aspheric optics, GRADIUM® glass products, proprietary collimator assemblies, laser components utilizing proprietary automation technology. LightPath has a strong patent portfolio that has been granted or licensed to us in these fields. LightPath common stock trades on the NASDAQ Capital Market under the symbol LPTH.

This news release includes statements that constitute forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. This information may involve risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, factors detailed by LightPath Technologies, Inc. in its public filings with the Securities and Exchange

Commission.

LightPath Technologies, Inc.
Condensed Consolidated Income Statements

|  | Unaudited Three months ended June 30, | | Audited Twelve months ended June 30, | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Product sales, net | $ 2,276,811 | $ 3,409,631 | $ 13,352,048 | $ 12,172,587 |
| Cost of sales | 2,226,089 | 2,960,632 | 10,306,046 | 10,119,458 |
| Gross margin | 50,722 | 449,000 | 3,046,002 | 2,053,129 |
| Operating expenses: | | | | |
| Selling, general and administrative | 1,011,383 | 1,048,631 | 4,515,579 | 4,434,704 |
| New product development | 343,399 | 276,709 | 1,174,132 | 1,038,390 |
| Amortization of intangibles | 8,217 | 8,217 | 32,868 | 59,535 |
| Gain on sales of assets | - | - | - | (9,134) |
| Total costs and expenses | 1,362,999 | 1,333,557 | 5,722,579 | 5,523,495 |
| Operating loss | (1,312,277) | (884,557) | (2,676,577) | (3,470,366) |
| Other income | | | | |
| Interest expense | (24,485) | (9,553) | (58,442) | (22,292) |
| Investment and other income | 40,933 | 68,741 | 120,390 | 123,777 |
| Net loss | $ (1,295,829) | $ (825,369) | $ (2,614,629) | $ (3,368,881) |
| Loss per share (basic and diluted) | $ (0.29) | $ (0.18) | $ (0.58) | $ (0.86) |
| Number of shares used in per share calculation | 4,506,230 | 4,463,542 | 4,500,853 | 3,929,132 |

LightPath Technologies, Inc.
Condensed Consolidated Balance Sheets
(Audited)

|  | June 30, 2007 | June 30, 2006 |
|---|---|---|
| Assets | | |

| | | | |
|---|---|---:|---:|
| Current assets: | | | |
| Cash and cash equivalents | | $ 1,291,364 | $ 3,763,013 |
| Trade accounts receivable, net of allowance of $28,968 and $85,800 | | 1,408,815 | 1,891,024 |
| Inventories, net | | 1,853,324 | 1,876,793 |
| Prepaid expenses and other assets | | 220,860 | 145,349 |
| Total current assets | | 4,774,363 | 7,676,179 |
| Property and equipment – net | | 1,563,250 | 1,172,651 |
| Intangible assets – net | | 232,605 | 265,473 |
| Other assets | | 57,306 | 59,731 |
| Total assets | | $ 6,627,524 | $ 9,174,034 |
| Liabilities and Stockholders' Equity | | | |
| Current liabilities: | | | |
| Accounts payable | | $ 1,278,328 | $ 1,668,683 |
| Accrued liabilities | | 326,525 | 236,501 |
| Accrued payroll and benefits | | 413,576 | 514,424 |
| Note Payable, current portion | | 166,645 | 270,710 |
| Capital lease obligation, current portion | | 16,285 | 14,255 |
| Total current liabilities | | 2,201,359 | 2,704,573 |
| Capital lease obligation, excluding current portion | | 23,653 | 39,937 |
| Note payable, excluding current portion | | 277,741 | -- |
| Total liabilities | | 2,502,753 | 2,744,510 |
| Stockholders' equity: | | | |
| Preferred stock: Series D, $.01 par value, voting; 5,000,000 shares authorized; none issued and outstanding | | -- | -- |
| Common stock: Class A, $.01 par value, voting; 34,500,000 shares authorized; 4,512,543 and 4,468,588 shares issued and outstanding | | 45,125 | 44,686 |
| Additional paid-in capital | | 196,417,217 | 196,064,721 |
| Foreign currency translation adjustment | | (43,059) | - |
| Accumulated deficit | | (192,294,512) | (189,679,883) |
| Unearned compensation | | - | - |
| Total stockholders' equity | | 4,124,771 | 6,429,524 |
| Total liabilities and stockholders' equity | | $ 6,627,524 | $ 9,174,034 |

Contacts:
Jim Gaynor
Interim CEO
Dorothy Cipolla
CFO
LightPath Technologies, Inc.
(407) 382-4003
Internet: www.lightpath.com

# EXHIBIT 4

## LightPath Announces Jim Gaynor as President & CEO

*(January 16, 2008) Orlando, FL.* LightPath Technologies, Inc. (Nasdaq: LPTH - News),

The LightPath Board of Directors has appointed Jim Gaynor as President & CEO of LightPath and a director of the Board. Jim Gaynor joined LightPath in July 2006 and, prior to his appointment as CEO, was LightPath's Executive Vice President of Global Operations.

Mr. Gaynor has 30 years of business experience in volume manufacturing in the electronics and optics industry. He started his career at Corning Glass Works and gained international experience at Rockwell International. He joined JDSU in 2000 as Vice President of Operations in the Transmission Subsystems Group. Prior to joining LightPath he was Director of Operations at Puradyn Filter. He has a mechanical engineering degree from Georgia Institute of Technology.

LightPath has also announced that Bob Ripp, LightPath's Chairman, will become more involved with the company to assist the executive team with strategic planning. Activities will include strategic focus on the LightPath business model and establishing financial goals and targets for the company. He will also assist in strategic initiatives regarding M&A activities, joint ventures, financing, and other external company matters as required.

Mr. Gaynor commented: "I am delighted to be appointed as CEO of LightPath. I am excited about the opportunities and very mindful of the challenges that the company must deal with. Since joining LightPath my principal focus has been on improving manufacturing processes to improve quality, delivery times, and cost reduction efforts."

Mr. Gaynor continued,"However for LightPath to significantly grow its revenues it must be able to produce high volume lens orders at competitive prices. To accomplish this, we needed a transformational change to our business model, and to become a high temperature glass manufacturer. This means improving our press capability, which we have with our proprietary Viper press. LightPath has made investments in ceramic molds as principal tooling, which will allow us to use high temperature pressing. The introduction of ceramic molds will allow us to change our purchased glass preforms at significant cost reductions. We are currently qualifying new glass suppliers."

Mr. Gaynor concluded, "LightPath now has a low cost platform to be able to serve as base for industrial laser products, high volume laser tools, and high volume laser telecom applications. Many of these initiatives will also help improve gross margins for our infrared and collimator product lines. We have the cost base and operational processes in place to expand the sales growth of the company."

Mr. Ripp commented: "When we started the CEO search we were looking for someone who could provide the leadership to execute the LightPath strategy. We were pleased to

be able to interview very capable candidates with excellent experiences and accomplishments to provide that leadership. Transforming the company from a low temperature glass manufacturer to a high temperature manufacturer requires strong understanding of the changes required to implement the new direction of the company.

The Board decided that Jim had the necessary operational experiences, was the architect of the current strategic shift for the company, has implemented several important cost reduction initiatives during the past few months, and more importantly has demonstrated a leadership attitude that has energized the company. The Board has confidence he will serve the company well."

**Webcast Details:**
LightPath plans to hold an audio webcast at 3:30 p.m. EST on January 31, 2008. The session may be accessed at www.lightpath.com. A transcript archive of the webcast will be available for viewing or download on our web site shortly after the call is concluded.

LightPath manufactures optical products including precision molded aspheric optics, precision molded infrared optics, GRADIUM® glass products, proprietary collimator assemblies, isolators utilizing proprietary automation technology, higher-level assemblies and packing solutions. LightPath has a strong patent portfolio that has been granted or licensed to us in these fields. LightPath common stock trades on the NASDAQ Capital Market under the symbol "LPTH." Investors are encouraged to go to LightPath's website for additional financial information.

Contact:    Jim Gaynor, President & CEO
LightPath Technologies, Inc.
Phone: (407) 382-4003
Email: jgaynor@lightpath.com
Internet: www.lightpath.com

This news release includes statements that constitute forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. This information may involve risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, factors detailed by LightPath Technologies, Inc. in its public filings with the Securities and Exchange Commission. Except as required under the federal securities laws and the rules and regulations of the Securities and Exchange Commission, we do not have any intention or obligation to update publicly any forward-looking statements whether as a result of new information, future events or otherwise.

*GRADIUM® is a registered trademark of LightPath Technologies*