**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HARBORVIEW MASTER FUND, LP,

               Plaintiff,

   -against-

LIGHTPATH TECHNOLOGIES, INC.,

KENNETH BRIZEL AND ROBERT RIPP

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CIVIL ACTION NO. 07 CIV. 09228 (NRB)

---

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

---

On the Brief
     Ross J. Ellick

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

      POINT I - HARBORVIEW HAS STATED ITS BREACH OF WARRANTY
      CLAIM .......................................................................................................................... 4

      POINT II - HARBORVIEW HAS ADEQUATELY PLED ITS SECURITIES
      FRAUD CLAIMS ....................................................................................................... 9

      A.  Defendants' Omissions Relating To Lightpath's Poor Operational And
          Financial Performance Prior To July 26, 2007, And Relating To Its
          Determination To Terminate The Employment Of Defendant Brizel,
          Are Actionable As A Securities Fraud Claim. ........................................................ 10

      B.  The Complaint Adequately Alleges That Defendants Had A Duty
          To Disclose The Adverse Events And Occurrences Which Led
          To Its Poor 4q07 Financial Performance, And Lightpath's Intention
          To Terminate The Employment Of Defendant Brizel. ........................................... 12

      C.  Defendant Brizel's June 29 Statements And Omissions Are Actionable ............... 17

      D.  Harborview Has Adequately Alleged Scienter ....................................................... 18

          1.     Harborview's Allegations Present a "Strong Inference" of Scienter ............... 19

          2.     Harborview Has Adequately Alleged Defendants' Motive And
                 Opportunity To Commit Fraud ....................................................................... 22

      POINT III - HARBORVIEW HAS STATED ITS SECTION 20(A) CONTROL
      PERSON CLAIM AGAINST DEFENDANT RIPP ................................................. 23

42949/0005-3110006v1

## TABLE OF AUTHORITIES

### CASES                                                                         Page

ABC Arbitrage Plaintiffs Group v. Tahuruk, 291 F.3d 336 (5th Cir. 2002)....................................8

Compudyne Corp. v. Shane, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) .......................................24, 25

In re Frank B. Hall & Co., Inc., 693 F. Supp. 1460 (S.D.N.Y. 1988)..........................................9

Green v. Hamilton Int'l Corp., 437 F. Supp. 723 (S.D.N.Y ........................................................16

IBP, Inc. Shareholders Litigation, 789 A.2d 14 (Del. Ch. 2001)..................................................8

Kohler v. Kohler Co., 319 F.2d 634 (7th cir. 1963)...................................................................16

LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortgage Lending, No. 04 Civ. 5452
    (PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007)....................................................4

Marcus v. Frome, 329 F. Supp. 2d 464 (S.D.N.Y. 2004) ..............................13, 22, 23,
    24

McCormick v. Fund American Cos., In., 26 F.3d 869 (9th cir. 1994)...........................................16

New Jersey and Its Division of Investment v. Sprint Corporation, 314 F. Supp.
    2d 1119 (D. Kansas 2004)..................................................................................13, 14

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000)...........................................................................22

In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133 (S.D.N.Y. 1999).............................24

Rogen v. Ilikon Corp., 361 F.2d 260 (1st Cir.1966) ..................................................................16

Rus, Inc. v. Bay Industries, Inc., 322 F. Supp. 2d 302 (S.D.N.Y. 2003) .......................................9

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir 1968), cert. denied,
    394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969) ....................................................16

Shaw v. Digital Equipment Corp., 82 F.3d 1194 (1st Cir. 1996)...........................................15, 17

Sloman v. Presstek, Inc., 2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007)......................19

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007)....................................10, 19

In re TimeWarner Inc. Securities Litigation, 9 F.3d 259 (2d Cir. 1993) ......................................13

## **STATUTES**

F.R.C.P. 9(b) and 12(b)(6) ............................................................................................. 22

42949/0005-3110006v1

## PRELIMINARY STATEMENT

Plaintiff, Harborview Master Fund, LP ("Harborview"), respectfully submits this memorandum of law in opposition to the motion by defendants LightPath Technologies, Inc. ("LightPath"), Kenneth Brizel ("Brizel") and Robert Ripp ("Ripp"), for an Order, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b), dismissing the First Amended Complaint ("Complaint") in its entirety. The motion should in all respects be denied.

Largely ignored by defendants' motion is Harborview's first cause of action sounding in breach of warranty, which is not even mentioned in defendants' Preliminary Statement and is ultimately the last claim addressed at the end of defendants' brief. This claim, which is not subject to any heightened pleading requirements of the PSLRA, derives from LightPath's breach of an express warranty, contained within the Stock Purchase Agreement at issue herein, "that there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect." Undeniably, and as established herein, as of the closing of Harborview's investment transaction on July 26, 2007, such events, occurrences or developments had arisen during LightPath's recently closed fiscal fourth quarter – e.g., the occurrences of extraordinary and costly operational issues and problems, which ultimately led to exceptionally poor financial results for the quarter, and to the company's determination to terminate the employment of its long-time and previously highly regarded CEO, defendant Brizel. This claim has been more than adequately pled, and is not subject to dismissal.

The same is time of Harborview's securities fraud claims. This is not a "classic case of fraud by hindsight," as defendants' contend. Nor does Harborview purport to hold defendants to a "clairvoyance" standard. To the contrary, Harborview's securities fraud claims allege, with great particularity, facts which give rise to a strong inference -- at least as compelling as the opposing inference suggested by defendants -- that defendants knew, at the time of the closing of

Harborview's investment, that the aforesaid material adverse events had occurred, and omitted to disclose them in connection with the solicitation of Harborview's investment, notwithstanding a legal duty to do so.

## STATEMENT OF FACTS

This action arises out of a $500,000 (125,000 shares at $4.00 per share) investment made by Harborview in defendant LightPath, pursuant to a private placement. The investment transaction closed on July 26, 2007, four (4) weeks after the close of the company's fiscal fourth quarter on June 30, 2007, and was governed by a written Stock Purchase Agreement. Complaint, ¶¶ 8, 14, 16, 25.

In addition to the fraudulent misrepresentations and omissions more fully discussed herein, Harborview made its investment in LightPath in reliance upon a representation and warranty by LightPath in the Stock Purchase Agreement that ". . . there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect . . . ." The term "Material Adverse Effect" is defined by the Securities Purchase Agreement (at Section 3.1(c)) to include "a material adverse effect on the result of operations, assets, business or condition (financial or otherwise) of the Company and the subsidiaries, taken as a whole." Id., ¶¶ 15, 45-46.

On September 19, 2007, LightPath issued a press release by which it announced a dramatic decline in revenues, resulting from the occurrence of various significant and costly operational issues. In the same press release, LightPath disclosed the termination of employment of the Company's CEO, defendant Brizel, effective immediately. Id., ¶ 18.

As the direct result of these disclosures, the price of the company's stock immediately dropped from its September 18, 2007 closing price of $4.75, to a closing price of $3.70 on

September 19, 2007, a single day decline of more than 22%. Id., ¶ 19. The stock is trading at approximately $1.50 today.

On September 18, 2007, the day before this fateful press release, Harborview representative David Stefansky had a telephone conversation with LightPath's Chairman, defendant Robert Ripp. During this conversation, defendant Ripp told Mr. Stefansky that LightPath's operational issues and problems, and the company's poor fourth quarter performance, were attributable to defendant Brizel, and were the cause of his firing. As also alleged (¶ 29), defendant Ripp acknowledged to Mr. Stefansky that, as of the closing of Harborview's investment on July 26, 2007, the company had determined to terminate defendant Brizel's employment. When confronted by Mr. Stefansky as to why this had not been disclosed defendant Ripp nervously responded that the decision had not been "finalized" as of that time. Id., ¶¶ 28-29.

As specifically pled in the Complaint, and as established herein, the extraordinary and costly operational issues sustained by LightPath during its fiscal fourth quarter, and LightPath's determination to terminate the employment of defendant Brizel as a consequence thereof, were clearly events, occurrences and developments, which necessarily occurred prior to the July 26, 2007 closing date of Harborview's investment, and which, in breach of the representations and warranties in the Stock Purchase Agreement, "had had or . . . could reasonably be expected to result in a Material Adverse Effect." Id., ¶¶ 16-34, 47.

In addition, since the Complaint adequately pleads that the defendants were aware of these extraordinary and costly adverse events (Id., ¶¶ 17-25, 28-30, 47, 49, 57, 60, 71), and failed to disclose them to Harborview in connection with the solicitation of its investment (Id., 13, 42, 57-60, 72, 77), despite a legal duty to do so (Id., ¶¶ 35-38, 74), Harborview has also stated claims

3

against defendants sounding in securities fraud, pursuant to Sections 10(b) and 20(a) of the

Securities and Exchange Act of 1934.

## ARGUMENT

### POINT I

### HARBORVIEW HAS STATED ITS BREACH OF WARRANTY CLAIM

As defendants acknowledge in their brief (p. 22), a claim for breach of warranty is stated

when a plaintiff alleges that "(1) plaintiff and defendant entered into a contract; (2) containing an

express warranty by the defendant with respect to a material fact; (3) which warranty was part of

the basis of the bargain; and (4) the express warranty was breached by defendant." LaSalle Bank

Nat'l Ass'n v. Merrill Lynch Mortgage Lending, No. 04 Civ. 5452 (PKL), 2007 WL 2324052, at

*8 (S.D.N.Y. Aug. 13, 2007).

There is no dispute in this action that the parties entered into the Securities Purchase

Agreement, dated July 26, 2007, and that it contains an express warranty by LightPath that

"[s]ince the date of the latest audited financial statements included within the SEC reports, . . .

there has been no event, occurrence or development that has had or that could reasonably be

expected to result in a Material Adverse Effect . . . ." The term "Material Adverse Effect" is

defined by the Securities Purchase Agreement (at Section 3.1(c)) to include "a material adverse

effect on the result of operations, assets, business or condition (financial or otherwise) of the

Company and the subsidiaries, taken as a whole." The only disputed issue is whether

Harborview has sufficiently pled that LightPath breached this warranty. As demonstrated below,

it has.

LightPath self-servingly and conclusorily argues (Brief, p. 23) that "[p]laintiff fails to

allege any facts that would establish that LightPath's 'operational and financial performance'

4

during that single quarter had caused, by July 26, any material adverse effect on the company as a whole." This contention totally misses the mark, and is wholly without merit.

First of all, LightPath completely mischaracterizes the terms of the warranty at issue. Harborview does not have to allege facts establishing that a Material Adverse Effect had been caused by July 26, 2007, as LightPath suggests. Rather, the applicable standard, as clearly set forth in the Stock Purchase Agreement, is whether there has been an "event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect." (Emphasis added.) Clearly, then, the issue is not whether a Material Adverse Effect had actually occurred as of July 26, 2007, but whether there had been an event, occurrence or development which could reasonably be expected to result in even a prospective material adverse effect upon the company's "operations, assets, business or condition (financial or otherwise)."

Harborview has adequately pled that there had been, prior to July 26, 2007, events, occurrences and developments that could reasonably have been expected to result in a Material Adverse Effect. The Complaint alleges (¶¶ 16-29, 28-34, 47-49) that during LightPath's fiscal fourth quarter, which ended on June 30, 2007 (almost four (4) weeks before the July 26, 2007 closing of Harborview's investment), extraordinary adverse operational and financial events had occurred which, along with the poor quarterly financial results they caused, were subsequently reported by LightPath in a September 19, 2007 press release.

As reported by LightPath in that press release, these adverse events and occurrences included "about $362,000 of late shipments due to manufacturing operational issues," as well as "one-time charges of $342,000 due to glass yield issues, overtime for direct labor, travel for engineering and management to resolve issues, and freight and duty expenses." Complaint, ¶ 17. In addition, and in the same breath, the press release announced that, effective immediately,

5

defendant Brizel would no longer be employed by the company, and that "[t]he company has engaged an Executive Search Firm to conduct a search for a new CEO."[1]

Indisputably, these negative events and occurrences, which amounted to what LightPath expressly acknowledged in its September 19, 2007 press release was "a poor financial performance in the fourth quarter," occurred _during_ the fiscal fourth quarter. It is inconceivable, and would be totally incredible were LightPath to suggest that its senior management was unaware of "manufacturing operational issues" (See, Complaint, ¶ 17) and "extraordinary and isolated operational issues, which negatively impacted our gross margin by $341,000 or 15% percentage points of gross margin" (See, Complaint, ¶ 20), when and as these issues occurred during the fourth quarter. In any event, Harborview is not required to plead or prove scienter to state or establish its breach of warranty claim, and what defendants knew and when they knew it gives rise to issues of fact which cannot be determined in the context of this motion.

Also without merit is LightPath's argument (Brief, pp. 23-24) that the events, occurrences and developments which admittedly resulted in an extraordinarily poor fiscal fourth quarter performance did not give rise to a Material Adverse Effect since, LightPath contends, its revenues for the _entire_ fiscal 2007 increased by 10%, its gross margin for the year increased by 6%, and its net loss per share for the entire fiscal 2007 improved. Obviously, however, LightPath's performance during its first three quarters of fiscal 2007 is totally irrelevant. The inescapable fact is that LightPath had an admittedly poor fiscal fourth quarter, both financially

---

[1] While not exactly arguing that defendant Brizel was not fired, defendants' refer to the September 19 press release as evidence that defendant Brizel "left without cause and that his termination was effective September 18." Brief, p. 10. While ultimately the issue is one of fact, clearly the announcement of the poor quarterly results and the immediate termination of the employment of defendant Brizel in the same press release confirm Harborview's allegations, premised upon statements made to Harborview representative David Stefansky by defendant Ripp (Complaint, ¶¶ 28-29), that defendant Brizel was fired as the result of the extraordinary adverse operational and financial problems which occurred during the fiscal fourth quarter.

and operationally, which were significant enough to cause the firing of the Company's long-time

CEO, without having procured a replacement, notwithstanding the company's prior

representations and risk factor disclosures that the company's "success was largely dependant

upon the personal efforts and abilities of Kenneth Brizel," and that the loss of Mr. Brizel, "before

a qualified replacement is found," could "materially adversely [affect]" the company's business.

Complaint, ¶ 32.  See also, Complaint, ¶ 33.  To be sure, the very purpose of the warranty at

issue was to assure Harborview that there had been no recent occurrences, like these, which

could adversely affect the company's business, even if the company had performed satisfactorily

overall during the first three fiscal quarters of 2007.

     The fact that these extraordinary adverse events, occurrences and developments during

the fiscal fourth quarter had a material adverse effect upon the company's "operations. . .

business or condition (financial or otherwise)," is evinced by the fact that they led to the

summary firing of defendant Brizel, and by the fact that the September 19 disclosure of the poor

4Q07 operational and financial results, and the firing of the CEO, caused the price of the

company's stock to drop from its September 18, 2007 closing price of $4.75, to a closing price of

$3.70 on September 19, 2007, a single day decline of more than 22%.  See, Complaint, ¶¶ 19, 51.

As of today, April 28, 2007, LightPath's stock is trading at approximately $1.50 per share.

     In addition, as the company had forewarned in its risk factor disclosures in its March 31,

2007 Form 10Q (Complaint, ¶ 32), and in its Form 10K for its fiscal year ended June 30, 2007

(Complaint, ¶ 33), finding a replacement for defendant Brizel proved difficult.  Indeed, despite

having engaged an Executive Search Firm to locate a replacement, on January 16, 2008, four (4)

months after the dismissal of defendant Brizel, the company announced that the interim-CEO,

7

Jim Gaynor, who was hastily appointed upon defendant Brizel's dismissal, would succeed defendant Brizel on a permanent basis. <u>See</u>, Wang Declaration, Exhibit 4.

In purported support of its argument that Harborview cannot establish that LightPath's 4Q07 results caused a Material Adverse Effect upon LightPath *as a whole*, LightPath cites <u>ABC Arbitrage Plaintiffs Group v. Tahuruk</u>, 291 F.3d 336, 360 (5th Cir. 2002), and <u>In re IBP, Inc. Shareholders Litigation</u>, 789 A.2d 14, 68 (Del. Ch. 2001). These cases are distinguishable, however, and in no way support LightPath's argument.

In <u>ABC Arbitrage</u>, the court determined that "it need not venture into the issue of whether the defendant's alleged overstatement of 125 millions French francs in its 1997 financial results was enough to allege a material affect upon the defendant, because the alleged overstatements concerned the defendants' subsidiary. Thus, the court held (291 F.3d at 360) that the plaintiff's efforts "to infer through conclusory assertions" that the defendants financials were overstated on a consolidated basis were insufficient as a matter of law. This, of course, has no relevance to the situation here, where the alleged misrepresentations and omissions relate to admittedly extraordinary and costly operational issues which impacted LightPath directly.

Equally irrelevant is <u>In re IBP, Inc. Shareholders Litigation</u>, a decision out of the Delaware Chancery Court, which was rendered "after massive amounts of discovery and two weeks of trial" 789 A.2d at 23. Thus the court's ultimate determination, after having stated that it was "confessedly torn about the correct outcome" (<u>Id</u>. at 71), was not rendered as a matter of law in the context of a pre-answer motion, as LightPath improperly asks this Court to do here. Clearly, as confirmed by <u>IBP</u>, the issue of whether the extraordinary and costly operational issues alleged here, and the company's termination of the employment of defendant Brizel,

constituted a Material Adverse Effect, is one of fact which cannot be resolved in the context of this 12(b)(6) motion.[2]

In sum, the Complaint alleges specific extraordinary negative events, occurrences and developments sustained by LightPath <u>during</u> its fiscal fourth quarter, and therefore necessarily prior to June 30, 2007. The Complaint further alleges that these events, occurrences and developments led to the company's subsequently reported poor quarterly results, and to the company's dismissal of its long-time CEO. Inescapably, then, the Complaint adequately pleads the occurrence, as of July 26, 2007, of specific events and developments which "could reasonably be expected to result in a Material Adverse Effect," and which did. Harborview's breach of warranty claim is adequately stated, and the motion to dismiss this claim should be denied.

## POINT II

### HARBORVIEW HAS ADEQUATELY PLED ITS SECURITIES FRAUD CLAIMS

With respect to Harborview's securities fraud claims, defendants argue that "Harborview is unable to plead with particularity any material misstatement by Brizel or omission by LightPath which it had a duty to disclose, nor can it plead the requisite scienter." Once again, however, defendants completely mischaracterize the nature of Harborview's claims to suit their

---

[2] <u>See</u>, <u>Rus, Inc. v. Bay Industries, Inc.</u>, 322 F. Supp.2d 302, 314 (S.D.N.Y. 2003) ("… material issues of fact exist as to whether the need for the Phase II investigation, when considered in light of the transaction as a whole and the nature of the environmental issues involved, constituted a material adverse effect that caused the representations in § 4.8 to be untrue."); <u>In re Frank B. Hall & Co., Inc.</u>, 693 F, Supp. 1460, 1464 (S.D.N.Y. 1988) ("Whether or not Touche Ross knew or should have known, at the time of the 1984 Hall audit that Hall's relationship with Global and/or Protective would have a material adverse effect on the consolidated financial position or results of operations of the Company is a disputed issue of fact for trial.").

9

purposes, and are wrong on all counts.  Harborview has more than adequately stated its securities fraud claims.[3]

<blockquote>

**A.    Defendants' Omissions Relating To Lightpath's Poor Operational And Financial Performance Prior To July 26, 2007, And Relating To Its Determination To Terminate The Employment Of Defendant Brizel, Are Actionable As A Securities Fraud Claim.**

</blockquote>

LightPath's contention that Harborview cannot state a claim based upon LightPath's alleged omissions relating to its poor operational and financial performance are based almost entirely upon LightPath's mischaracterization of Harborview's claim as alleging that LightPath knew and failed to disclose its 4Q07 results prior to July 26, 2007, before its audit was even completed.  Thus, defendants erroneously contend (Brief, pp. 9-10) that "LightPath can only have made an actionable omission if it knew its 4Q07 results by July 26."  This is simply not Harborview's claim, however, and LightPath's self-serving "straw man" focus upon LightPath's audited results, and whether Harborview has alleged that LightPath knew those audited results as of July 26, is entirely misplaced.

Harborview's claims are not premised upon LightPath's specific audited financial results for 4Q07, but upon the occurrence of admittedly extraordinary adverse operational events, problems and issues which gave rise to them.  By definition these adverse events, problems and issues occurred during LightPath's fiscal fourth quarter, and therefore before June 30, 2007.

As alleged in the Complaint (¶ 17, 20), the specific events and occurrences which caused LightPath's poor financial 4Q07 results were described by LightPath itself in its September 19

---

[3] The procedural law is well established that, "faced with a federal law of civil procedure 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2502 (2007).

10

and October 1, 2007 press releases. These events and occurrences were "late shipments due to manufacturing operational issues," "glass yield issues," "overtime for direct labor," and travel for engineering and management to resolve issues." As also pled in the Complaint (¶ 20, 24, 27), LightPath's press releases acknowledge that these adverse events and occurrences were "extraordinary," and extremely costly, with the dollars attributable to them adding up $703,000, or 31% of LightPath's gross sales for the quarter.

Since Harborview's fraud claims are not based upon allegations that LightPath knew or should have known, and therefore should have reported its actual audited 4Q07 results prior to July 26, 2007, defendants' arguments alluding to "fraud by hindsight," and that defendants had no obligation to prematurely report and disclose LightPath's 4Q07 results, totally miss the mark and are beside the point. As is defendants' contention that it had no obligation to anticipate future events, or to be "clairvoyant."

Plain and simple, the allegations in the Complaint are that defendants knew, during the quarter, of the occurrence of admittedly extraordinary adverse operational and financial events and issues which resulted in LightPath's ultimately reported poor 4Q07 results. Harborview's contentions are that defendants were obliged to disclose these material events and occurrences, as opposed to the precise 4Q07 results that they caused.

Also without merit is defendants' contention (Brief, p.10) that Harborview "has also failed to plead any facts to suggest that even if LigthPath had known its 4Q07 results internally, it was engaged in deliberations to terminate its CEO on the basis of those results at that time."

Indeed, the Complaint alleges (¶¶ 28-29) that during a telephone call on or about September 18, 2007, defendant Ripp told Harborview representative David Stefansky that LightPath's operational issues and problems, and the company's poor fourth quarter

11

performance, were attributable to defendant Brizel, and were the cause of his firing. As also alleged (¶ 29), defendant Ripp acknowledged to Mr. Stefansky that the company had determined to terminate defendant Brizel's employment as of July 26, 2007. Defendants all but ignore these allegations, addressing them only in a footnote in their brief (n.4, p.4), and stating only that defendant Ripp denies them. Harborview's allegations must be deemed true for purposes of this motion, however, and at a minimum these specific allegations give rise to issues of fact as to whether LightPath had determined to fire Brizel as of July, 26, 2007. If so, as demonstrated below the Complaint properly alleges that defendants had a duty to disclose LightPath's intent to terminate the employment of defendant Brizel.

> **B.    The Complaint Adequately Alleges That Defendants Had A Duty To Disclose The Adverse Events And Occurrences Which Led To Its Poor 4q07 Financial Performance, And Lightpath's Intention To Terminate The Employment Of Defendant Brizel.**

Defendants contend (Brief, p. 11) that Harborview "has failed to plead any facts that suggest that awareness of those events led to a duty to disclose the events or their financial effect at any time before LightPath knew how its financials would be affected." Defendants are wrong.

It is undeniable that defendants Brizel and LightPath became aware of the admittedly extraordinary adverse events and occurrences which led to its poor 4Q07 performance at or about the time that they occurred, and certainly by July 26, 2007, almost four (4) weeks after the quarter had closed. The Complaint (¶¶ 28-29) also alleges that LightPath had determined as of July 26, 2007 to terminate the employment of defendant Brizel. As demonstrated below, the Complaint also pleads, and the law provides, that defendants Brizel and LightPath had a duty to disclose these facts, events and circumstances to Harborview in connection with the solicitation of its investment.

The law is clear that "a duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." In re TimeWarner Inc. Securities Litigation, 9 F.3d 259, 268 (2d Cir. 1993). Here, the Complaint properly pleads (¶ 35) that LightPath and Brizel's failure to disclose the operational issues and problems that LightPath had experienced during its fourth quarter, and that it had lost complete confidence in and had decided to fire defendant Brizel, rendered false and misleading LightPath's statements, representations and warranty in the Stock Purchase Agreement that "[s]ince the date of the latest audited financial statements included within the SEC reports, … there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect..." Therefore, LightPath and Brizel had a duty to disclose these facts, events and occurrences in connection with the solicitation of Harborview's investment. Cf., Marcus v. Frome, 329 F.Supp.2d 464 (S.D.N.Y. 2004) (Complaint sustained in action where misrepresentations in purchase agreement were alleged as the basis for Section 10(b) claim.).

As also pled in the Complaint (¶ 36), LightPath had an affirmative duty to disclose its loss of confidence in defendant Brizel, and the impendency of its termination of his employment, since these undisclosed facts rendered false and misleading LightPath's statements in its March 31, 2007 10Q, filed on May 15, 2007, which indicated that the company was happily employing a CEO in whom it had tremendous confidence, upon whom the company's success was largely dependant," and the loss of whom could materially adversely effect the prospects and results of operations of the company. See, Complaint, ¶¶ 32-33.

A case in point is New Jersey and Its Division of Investment v. Sprint Corporation, 314 F. Supp. 2d 1119 (D. Kansas 2004). There, the plaintiffs brought a Section 10(b) claim against

defendant Sprint Corporation in which it alleged, <u>inter alia</u>, that Sprint had improperly failed to disclose to investors the possibility or inevitability of its termination of the employment of two (2) of its senior executives, William T. Esrey and Ronald T. LeMay. The plaintiffs alleged that Sprint's omissions in this regard rendered misleading statements made by Sprint in public filings that Sprint had entered into employment contracts with Esrey and LeMay designed to insure their long-term employment with Sprint. Taking a position similar to that taken by LightPath herein, Sprint moved to dismiss the complaint, contending that it had not yet finalized its plans to terminate Messrs. Esrey and LeMay, and that it had no duty to disclose "uncertain" or "contingent" plans. <u>Id</u>. at 1131.

      The court denied Sprint's motion to dismiss, stating as follows:

> In other words, according to plaintiffs, defendants failed to disclose information that completely negated the statements made by Sprint concerning the long-term employment of its top two executives. In that respect, then, this case represents an easier question regarding the duty of disclosure than the *Time Warner* case, as the distinct possibility or inevitability that Mssrs. Esrey and LeMay would be terminated obviously casts a different light on Sprint's statements concerning their efforts to insure the long-term employment of the executives. *See id.* ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."). <u>The court, then, denies the Sprint defendants' motion to dismiss to the extent that plaintiffs contend that the specific statements concerning the long-term employment of Mssrs. Esrey and LeMay were rendered misleading by the failure to disclose the possibility or inevitability that the employment of Mssrs. Esrey and LeMay might well be terminated as a result of the tax shelters.</u>

<u>Id</u>., at 1132-1133 (emphasis added).

      Here, by its March 31, 2007 10Q, filed on May 15, 2007, LightPath continued to exhibit great confidence in defendant Brizel's abilities, and represented to the public that his continued employment was not only desired, but that he was essential to the company's success (<u>See</u>,

14

Complaint, ¶ 32). Moreover, in June 2007, and specifically during his June 29, 2007 conference call with Harborview representatives Jesse Kaplan and Benjamin Mayer, defendant Brizel was LightPath's point person for purposes of interfacing with Harborview and other prospective private placement investors, and all indications were that Brizel had the confidence of the company, and that he was firmly in place as the company's CEO (See, Complaint, ¶12). This was also true as of July 26, 2007, as defendant Brizel signed the Stock Purchase Agreement on behalf of LightPath (See, Wang Declaration, Exhibit 1, p. 35).

To the extent that LightPath was even considering firing defendant Brizel as of July 26, 2007 -- and the Complaint (at ¶ 29) adequately pleads that LightPath had determined to do so as of that time -- then LightPath's failure to disclose its loss of confidence in defendant Brizel rendered misleading its aforesaid prior statements and indications that defendant Brizel was held in high regard and was firmly in place as the company's CEO. As such, clearly LightPath had a duty to disclose its intentions to fire defendant Brizel to Harborview in connection with the solicitation of its investment.

LightPath's duty to disclose to Harborview the aforesaid adverse events and occurrences, and its internal determination to fire defendant Brizel, also derives from the fact that LightPath, as a seller of securities by way of the private placement, had a legal duty to either disclose what is clearly insider information, or to abstain from selling its stock to Harborview and the investors by way of the private placement (See, Complaint, ¶38).

In Shaw v. Digital Equipment Corp., 82 F.3d 1194 (1st Cir. 1996), the court acknowledged the well-established principle that:

> There is no doubt that an individual corporate insider in possession of material nonpublic information is prohibited by the federal securities laws from trading on that information unless he makes public disclosure. He must disclose or abstain from trading. See

> *SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir 1968) (en banc), cert. denied, 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969)*.
>
> *    *    *
>
> The policy rationale for the "disclose or abstain" rule carries over to contexts where a corporate issuer, as opposed to an individual, is the party contemplating a stock transaction. Courts, including this one, have treated a corporation trading in its own securities as an "insider" for purposes of the "disclose or abstain" rule. *See, e.g., McCormick v. Fund American Cos., In., 26 F.3d 869, 876 (9th cir. 1994)* (collecting cases) ("[T]he corporate issuer in possession of material nonpublic information must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them."); *Rogen v. Ilikon Corp., 361 F.2d 260, 268 (1st Cir.1966); Kohler v. Kohler Co., 319 F.2d 634, 638 (7th cir. 1963); Green v. Hamilton Int'l Corp., 437 F. Supp. 723, 728-29 (S.D.N.Y. 1977*.
>
> *    *    *
>
> By extension, a comparable rule should apply to issuers engaged in a stock offering. Otherwise, a corporate issuer selling its own securities would be left free to exploit its informational trading advantage, at the expense of investors, by delaying disclosure of material nonpublic negative news until after completion of the offering.

Under the authority of Shaw, this duty to disclose extends to material pre-end-of-quarter facts and events which are likely to lead to poor quarter end results. Indeed, the defendant in Shaw argued, as does LightPath here, that it under no circumstances had any duty to disclose "intra-quarterly" results, or any other information concerning its third quarter performance, until after the quarter ended. In rejecting the defendants' contentions, and denying its motion to dismiss the complaint, the court held:

> Defendants posit, in essence, that there can never be a duty to disclose internally known, pre-end-of quarter financial information, because any inferences about the quarter that might be drawn from such information could be rendered unreliable by later developments in the same quarter, such as a sudden surge of profitable sales. This position does not withstand scrutiny. <u>Present, known information that strongly implies an important future outcome is not immune from mandatory disclosure merely because it does not foreordain any particular outcome. The</u>

16

> question whether such present information must be disclosed
> (assuming the existence of a duty), poses a classic materiality
> issue; given that at any point in a quarter, the remainder of the
> period may not mirror the quarter-to-date, is there a sufficient
> probability that unexpectedly disastrous quarter-to-date
> performance will carry forward to the end of the quarter, such that
> a reasonable investor would likely consider the interim
> performance important to the overall mix of information available?

82 F.3d at 1210 (emphasis added)

Here, at the time that LightPath was actively soliciting Harborview's investment, after its fiscal fourth quarter had been closed for almost a month, the Complaint alleges that LightPath was in possession of material information regarding extraordinary and costly operational issues and problems that had arisen during the quarter, and which were going to (and did) have a significant adverse impact upon the Company's quarterly results. Moreover, the Complaint alleges that the Company had, as of the same time, attributed the problems and poor performance to defendant Brizel, and had determined to fire him, without a replacement. Under these circumstances, and under Shaw and the authorities it relies upon, defendants were not free to remain silent on these material facts, events, and circumstances while LightPath sold securities to Harborview, simply because their quarterly financials had not yet been audited and finalized. Rather, the law required LightPath to either disclose this non-public material information, or to abstain from selling its stock. The Complaint adequately pleads a duty by LightPath to make the disclosures alleged, and its failure to do so is actionable securities fraud.

### C. Defendant Brizel's June 29 Statements And Omissions Are Actionable.

Defendants argue (Brief, p. 7) that the alleged statements made by defendant Brizel during the June 29 telephone call – e.g., that defendant Brizel "touted LightPath's products, markets, and technology, and represented to Harborview that the company was performing well and that sales and profitability were on the rise" (Complaint, ¶ 12)) -- were mere "puffery," and

17

that "Harborview has not stated how these statements were materially misleading at the time they were made." Defendants are incorrect, as they conveniently fail to address defendant Brizel's alleged omissions, which are clearly actionable.

With respect to the extraordinary negative operational and financial events and occurrences that LightPath indisputably sustained during its fiscal fourth quarter, the Complaint alleges (¶¶ 25,57) that defendant Brizel, as the company's CEO, had to know of these issues and problems on June 29, 2007, the day before the end of the fiscal fourth quarter. As such, and in this context, defendant Brizel's omissions rendered his statements that "the company was performing well, and that sales and profitability were on the rise," false and misleading.

### D.    Harborview Has Adequately Alleged Scienter.

Defendants' contentions to the contrary, Harborview does not purport to fault defendants for a lack of "clairvoyance," nor for any alleged faulty prognostications. As such, defendants' arguments that Harborview has not alleged scienter (and the authorities cited in purported support) self-servingly based upon defendants' mischaracterization of Harborview's claims as amounting to "fraud by hindsight," totally miss the point.

Harborview's securities fraud claims allege that defendants Brizel and LightPath were aware, prior to and as of July 26, 2007, of the occurrence of significant and material factual events occurrences, and developments, which the complaint alleges amounted to an extraordinarily poor 4Q07 operational and financial performance of LightPath, and to the company's resultant determination, prior to July 26, 2007, to terminate the employment of defendant Brizel. As demonstrated below, these allegations sufficiently allege defendants' scienter.

18

**1.    Harborview's Allegations Present a "Strong Inference" of Scienter**

The standard to be applied for purposes of determining whether Harborview's allegations adequately allege scienter – e.g., whether the facts alleged give rise to a "strong inference" of scienter—was clarified by the United States Supreme Court, in Tellabs, Inc. v. Makov Issues & Rights, Ltd., 127 S. Ct. 2499. (2007). The Tellabs standard was recently summarized and articulated by this Court (McMahon, J.) in In Re Top Tankers, Inc. Securities Litigation, 2007 WL 4563930 (S.D.N.Y.), as follows:

> In the relevant addition to PSLRA jurisprudence, the Supreme Court announced that the "strength of inference" inquiry was "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" Tellabs, 127 S. Ct. at 2510. District courts faced with PSLRA motions to dismiss were told to consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. We were further instructed that a complaint adequately pleaded scienter (that is, the inference of scienter could be deemed "strong") only if a reasonable person would deem the inference of scienter both "cogent" and "at least as likely as any plausible opposing inference." Id. at 2504-06,2513. The Tellabs decision also emphasizes that the inquiry is to be made in the context of a traditional motion to dismiss--assuming the well-pleaded facts of the complaint to be true--and that all the facts alleged, taken collectively, must be considered in deciding whether the pleading gives rise to a strong inference of scienter. Seizing on the "at least as likely" language, courts since Tellabs have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the "tie … goes to the plaintiff." See, e.g., Sloman v. Presstek, Inc., 2007 U.S. Dist. LEXIS 69475, at *24-25 (D.N.H. Sept. 18, 2007).

Id. at *5 (emphasis added).

42949/0005-3110006v1

Thus, if the inference of scienter proffered by Harborview is at least as compelling as defendants' nonculpable explanation for their conduct, then Harborview has adequately pled the requisite scienter to sustain its securities fraud claims.[4]

It is undeniable that admittedly extraordinary and costly operational events and issues occurred at and to LightPath, during its fiscal fourth quarter ending on June 30, 2007. Clearly, Harborview's allegations that LightPath, by its senior management, including defendant Brizel, were aware of these events and occurrences at or about the time of their occurrence, and certainly by July 26, 2007, almost four (4) weeks after the close of the quarter, give rise to an inference of scienter at least as compelling as defendants' efforts (Brief, p. 15) to completely sidestep the issue by once again focusing on LightPath's final 4Q07 results (as opposed to the actual facts and events that caused them) and arguing that it is not plausible that defendants would have known LightPath's actual 4Q07 results prior to the close of the quarter, and even four (4) weeks after the close of the quarter.

Moreover, not only is it obvious, from a common sense standpoint, that LightPath was aware of the aforesaid extraordinary operational and financial issues, events and occurrences at or about the time that they were occurring, but LightPath's September 19 press release confirms this fact. Indeed, in that release, LightPath's Chief Financial Officer, Dorothy Cipolla, is quoted as follows:

> To offset the poor financial performance in the quarter, over the
> last few months the company has reduced the workforce in
> Orlando by 25 staff, bringing the headcount to 88.

---

[4] Actually, Harborview does not even require an "inference" of scienter, since defendants clearly had actual knowledge, prior to July 26, 2007, of the material adverse factual events and occurrences which caused LightPath's extraordinarily poor fiscal fourth quarter performance (see, Complaint, ¶17-25, 47, 57, and 71), and since LightPath also knew, as of July 26, 2007, that it was going to terminate the employment of defendant Brizel (see, Complaint, ¶ 28-29).

Harborview submits that this statement is a clear confirmation of the obvious fact that the company knew it was experiencing significant and costly operational issues, as they were occurring during the fourth quarter. The statement clearly indicates that "over the last few months" prior to September 19, 2007, the company significantly reduced its workforce in Orlando "[t]o offset the poor financial performance in the fourth quarter." The plain meaning of these words is that, starting "a few months" prior to September 19, 2007, or approximately mid-July 2007, LightPath had commenced a staff reduction which was at least partially motivated by its awareness that it had performed poorly in its fiscal fourth quarter, and its stated desire to offset that poor performance with cost reductions. Since mid-July is at least a few weeks after the close of the fourth quarter on June 30, 2007, and is prior in time to the July 26, 2007 closing of Harborview's investment, there is nothing incredible about Harborview's allegations--supported by Ms. Cipolla's own words--that LightPath was aware as of the closing of Harborview's investment on July 26, 2007, not of its exact and precise audited financial results, but of the undisputed fact that it had performed extremely poorly during the quarter. As to defendants' factual contention that the entire reduction in staff in Orlando was solely based upon the company's shifting of its production to Shanghai, at best this gives rise to factual issues which are not properly resolved in the context of this 12(b)(6) motion to dismiss.

With respect to LightPath's alleged knowledge, as of July 26, 2007, that is had determined to fire defendant Brizel, Harborview submits that the inference to be drawn from its allegations--based upon defendant Ripp's statements to Mr. Stefansky that such a determination had been made (Complaint, ¶¶ 28-29)--are at least as compelling as (and far more credible than) defendants' apparent contention that the decision to fire defendant Brizel was made in a vacuum, on the very date of the September 19 press release, and the effective date of his termination.

       2.      **Harborview Has Adequately Alleged**
              **Defendants' Motive And Opportunity**
              **To Commit Fraud**

As far as the motive to commit fraud is concerned, the Complaint adequately alleges (at ¶¶ 39-42, 61 and 76) the requisite "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *See*, Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). Specifically, the Complaint alleges (¶¶ 39-42) that the defendants were motivated to commit fraud by the fact that LightPath was attempting to raise scarce and necessary capital through its private placement, and that the disclosure by LightPath of its fiscal fourth quarter operational and financial difficulties, and that it had determined to terminate the employment of its CEO, would jeopardize the private placement, and LightPath's ability to raise the needed capital. Indeed, the Complaint alleges (¶41) that Harborview would not have made its investment if it had known these facts. As set forth below, the raise of capital by LightPath through the private placement is clearly a "concrete benefit" realized by LightPath that is sufficient for purposes of alleging a motive to commit fraud.

Marcus v. Frome, 329 F. Supp. 2d 464 (S.D.N.Y. 2004) is instructive. There, similar to the situation here, the plaintiffs transferred various assets to a corporate entity named the Continuum Group ("Continuum"), pursuant to a purchase agreement, and received Continuum stock in return. Alleging fraudulent misrepresentations in the purchase agreement, the plaintiffs brought securities fraud claims under § 10(b). The defendants moved to dismiss, pursuant to F.R.C.P. 9(b) and 12(b)(6), on the purported grounds that the plaintiffs had failed to adequately plead scienter as required under Rule 9(b) and the PSLRA. In finding that the plaintiffs had adequately pled scienter, this Court (Koeltl, J.) held that the plaintiffs allegations that Continuum obtained tangible and valuable assets and income as the result of the Purchase Agreement sufficiently alleged a motive to commit fraud. *See*, 329 F. Supp. 2d at 473.

Here, as in <u>Marcus</u>, LightPath received the monies invested by Harborview and the other investors, and the Complaint therefore alleges the requisite concrete benefits necessary to support defendants' motive to commit fraud.[5]

In terms of opportunity to commit fraud, the Complaint clearly and adequately alleges (¶¶ 61,76) that defendants had the ability to control the dissemination of information to Harborview and the other investors, and obviously LightPath had the opportunity to commit fraud through its representation and warranty as to the non-occurrence of events which reasonably could lead to a Material Adverse Effect.  <u>See</u>, <u>Marcus v. Frome</u>, <u>Supra</u>, 329 F. Supp. 2d at 473 ("There is no dispute that the defendants had an opportunity to commit fraud through the various representations and warranties they made in the Purchase Agreement…").[6]

### POINT IIIII

### HARBORVIEW HAS STATED ITS SECTION 20(A) CONTROL PERSON CLAIM AGAINST DEFENDANT RIPP

To plead liability under § 20(a):

> a plaintiff must show:  (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  <u>Dietrich v. Bauer</u>, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) ("<u>Dietrich III</u>") (citations omitted).  <u>In the Second Circuit, "the 'control person'</u>

---

[5] Since the concrete benefits alleged herein constitute material benefits received by LightPath as the result of the fraudulent conduct alleged, this case is totally dissimilar to the cases cited by defendants (Brief p. 16-17) that the requisite concrete benefits cannot be established by allegations that fraud was perpetrated in order to give rise to "an appearance or profitability," or with "the desire to maintain a high stock price in order to increase executive compensation."  In this case, and unlike those cases purportedly relied upon by defendants, Harborview has alleged a motive by defendants to enable LightPath to obtain a concrete benefit; necessary capital.

[6] Defendants' erroneous contention (Brief, p. 16,. n. 10) to the contrary, Harborview has alleged, in the alternative, that defendant Brizel's and LightPath's omissions were recklessly made.  <u>See</u>, Complaint, ¶¶ 60, 77.  Indeed, to the extent that defendants contend that Harborview has failed to adequately plead motive and opportunity, then clearly Harborview has alleged that defendants' failure to disclose the adverse acts, events and occurrences which no doubt occurred during the fiscal fourth quarter, was reckless in that, as alleged (Complaint, ¶ 77), it constituted highly unreasonable conduct which represents an extreme departure from the standards of ordinary care.

> provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'" *Id.* at 765. "For purposes of Section 20(a) liability, 'actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.'" *Id.* (citations omitted). Whether a person is a "controlling person" is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss. *In re* Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 143 (S.D.N.Y. 1999).

Compudyne Corp. v. Shane, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (emphasis added).

The Complaint alleges that defendant Ripp, as the company's Chairman since 1999, and having previously served as the company's President and CEO, was "involved in and had the power to and did control and direct the management and policies of defendant Brizel, and the management and operations of LightPath, as well as the disclosure and flow of information relating to the company." Complaint, ¶ 88.

The Complaint further alleges that on February 14, 2007 defendant Ripp executed defendant Brizel's written employment contract on behalf of LightPath, as well as the September 18, 2007 amendment to that contract which memorialized the company's severance agreement with defendant Brizel. *See*, Complaint ¶ 89.

Moreover, the Complaint alleges (¶ 88) that defendant Ripp told Mr. Stefansky, on or about September 18, 2007, that he had played the lead role in terminating defendant Brizel's employment as the result of the company's poor operational and financial performance during its fiscal fourth quarter.[7] Consistent with this statement, and further supporting defendant Ripp's

---

[7] Defendant Ripp attempts to make much of a technical semantic distinction between Harborview's original complaint and its First Amended Complaint, with respect to the allegations concerning the leadership role played by defendant Ripp in LightPath's firing of defendant Brizel. Specifically, that the original complaint alleged that defendant Ripp "was leading the efforts" to terminate defendant Brizel, while the First Amended Complaint alleges that defendant Ripp told Mr. Stefansky that he "had played the lead role in terminating defendant Brizel's employment." The purported distinction is one without a difference. Considering that the conversation between Mr. Stefansky and defendant Ripp was always alleged to have occurred on September 18, 2007, the very effective date of the termination of defendant Brizel's employment (See, Wang Declaration, Exhibit 2), the original allegation that (continued...)

direct involvement in the day-to-day operations of the company, defendant Ripp was quoted at length in the September 19 press release concerning LightPath's goals, and what the company would be looking for in a new CEO. (See, Complaint, ¶ 90; Wang Declaration, Exhibit 2).

In terms of defendant Ripp being a "culpable participant in the primary violation," the Complaint alleges (¶¶ 92), in addition to all of the foregoing, that defendant Ripp was aware of LightPath's solicitation of Harborview's investment, and was aware of, but failed to disclose or cause LightPath to disclose, the material facts which Harborview alleges were fraudulently concealed. The Complaint further alleges (¶ 93) that defendant Ripp's failure to cause these concealed facts to be disclosed to Harborview constituted either conscious misbehavior or recklessness. Under the aforesaid Second Circuit standard indicated in Compudyne, supra, these omissions by LightPath, as enabled by defendant Ripp, and under his guidance, coupled with defendant Ripp's failure to make or cause LightPath to make the requisite disclosures, have been stated with sufficient particularity by Harborview at the pleading stage. Ultimately, defendant Ripp's role as a control person is a "fact –intensive inquiry," not presently ripe for determination in connection with this motion. See, Compudyne, 453 F.Supp. 2d at 829 ("Whether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.").

As such, defendant Ripp's motion to dismiss Harborview's Ninth Cause of Action should be denied.

---

(…continued)
defendant Ripp "was leading" the efforts could only mean that he had "led the effort," as more precisely alleged in the First Amended Complaint.

## CONCLUSION

Based upon the foregoing, it is respectfully submitted that Harborview has adequately stated all of its claims herein, and that defendants' motion to dismiss should in all respects be denied.

DATED:        New York, New York
              April 28, 2008

                                        Respectfully submitted,

                                        COLE, SCHOTZ, MEISEL,
                                        FORMAN & LEONARD, P.A.
                                        Attorneys for Plaintiff

                                        By: _____
                                              Ross J. Ellick, Esq. (RE-9117)
                                              900 Third Avenue, 16th Floor
                                              New York, New York  10022-4728
                                              Tel:  (212) 752-8000

26