UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARBORVIEW MASTER FUND, LP,

    Plaintiff,

v.

LIGHTPATH TECHNOLOGIES, INC.,
KENNETH BRIZEL and ROBERT RIPP,

    Defendants.

Civil Action No. 07 Civ. 09228 (NRB)

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**BAKER & HOSTETLER LLP**
Ona T. Wang (OW-5462)
Benjamin Pergament (BP-4719)
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200
(212) 589-4201 (fax)

May 30, 2008

*Attorneys for Defendants*

## LEGAL ARGUMENT

I. **PLAINTIFF'S FEDERAL CLAIM(S) MUST BE DISMISSED.**

In Defendants' moving brief, we demonstrated that Plaintiff had failed to plead the elements of a federal securities fraud claim under the heightened pleading requirement of Rule 9(b), as Plaintiff had made only conclusory assertions that Defendants knew and should have disclosed certain events sooner. In its opposition, Plaintiff does nothing to address or distinguish binding and dispositive Second Circuit law, restates and reframes its conclusory allegations, and incorrectly analyzes the little case law it does cite; accordingly, Plaintiff's federal claims – sounding in securities fraud and Section 20(a) control person liability – should be dismissed.

A. **Plaintiff has identified no statements or omissions before July 26 that were materially misleading at the time they were made.**

The core of Plaintiff's securities fraud claim is that the information disclosed in LightPath's September 19 press release should have been disclosed at some time before July 26 because – according to Plaintiff – LightPath either knew or should have known that information before July 26. Plaintiff has not and cannot plead facts that suggest that any pre-July 26 statements were false at the time they were made. Rather, Plaintiff makes only conclusory allegations that Defendants "knew" such information before July 26, asserting, for example, that Mr. Brizel "had to know" of the operational issues that led to LightPath's 4Q07 results even before the end of the quarter, (Pl.'s Mem. at 18), conflating pleading of a material misstatement or omission with pleading scienter. Plaintiff ignores Second Circuit case law that requires factual support when a plaintiff claims a defendant had access to contrary facts and failed to disclose them earlier. Specifically, plaintiffs must specify the conflicting earlier reports, identify the people who prepared them and when, and specify which company officers would have reviewed those reports by the time of the alleged omission. *See In Re Scholastic Corp. Sec.*

1

*Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp.2d 505, 517 (S.D.N.Y 2007) (J. Chin). This Plaintiff has utterly failed to do.

Indeed, even *New Jersey v. Sprint Corp.*, cited by Plaintiff, supports LightPath's position. 314 F. Supp.2d 1119 (D. Kan. 2004). In *Sprint*, the Court dismissed claims based on Sprint's alleged failure to disclose in its financial reports the possibility that its top two executives would be terminated. *Id.* at 1129-30 (finding theory "untenable" that Sprint could be liable for investors' decision to invest on assumption that past trends and successes in prior accurate reports would continue). The Court only permitted claims based on Sprint's affirmative statement in 2002 that it had entered into new employment contracts "designed to insure [the Sprint executives'] long-term employment" because the plaintiffs had pointed to specific events and facts in the preceding two years that showed that Sprint had already been considering these executives' termination at the time the affirmative statement was made. *Id.* at 1130. Plaintiff does identify LightPath's annual report for fiscal year 2006, but only for its risk factor that states that LightPath's success "will be largely dependent upon the personal efforts and abilities of" Mr. Brizel. (Am. Compl. ¶ 32; Wang Reply Decl. Ex. 1 at 19.) Unlike Sprint's affirmative representation that its executives had entered into new employment contracts to insure their long-term employment, LightPath's annual report explicitly cautions that Mr. Brizel "is not bound by an employment agreement." (Wang Decl. Ex. 1 at 19.)

Equally unavailing is Plaintiff's novel argument that its securities fraud claims are not based on the 4Q07 financial results, but on the underlying events that contributed to those results, namely late shipments, glass yield issues, overtime and travel costs incurred in 4Q07. (*See* Pl.'s Mem. at 11.) LightPath would only have had to disclose those events if they were material, which would require – again – Defendants to have been aware of the financial effect of

2

those events well before the audit was completed. Plaintiff has pleaded no facts to suggest that Defendants either were aware of these events or the effect that they would have on 4Q07 results. Plaintiff's argument is illogical: on the one hand it claims that it is not requiring LightPath to be clairvoyant and report its financial results before its audit was completed, (Pl.'s Mem. at 11), yet, at the same time, under Plaintiff's theory Defendants were required to know the financial impact of certain 4Q07 events *and* determine that that impact would be material, all before July 26. (Pl.'s Mem. at 17.)

**B.    Plaintiff's conclusory allegations are insufficient to plead scienter.**

Likewise, Plaintiff's scienter argument requires Defendants' clairvoyance, as Plaintiff has not pointed to anything beyond rank speculation that LightPath "knew" or "had to know" before July 26 the information that was ultimately disclosed in September.[1] In light of *Tellabs* and its recent progeny, if a plaintiff can demonstrate a strong inference of scienter "at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff." *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2007 WL 4563930 at *5 (S.D.N.Y., Dec. 18, 2007) (J. McMahon) (internal citations and quotations omitted; citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007) and explaining *Tellabs'* requirement to consider plausible nonculpable explanations for defendants' conduct). Here, however, Plaintiff has failed to plead facts suggesting any inference of scienter – let alone a strong one – in the face of Defendants' more plausible nonculpable explanation. Plaintiff focuses on operational events that led to the 4Q07 results rather than the results themselves –

---

[1] Plaintiff claims, with no reference to any facts or case law, that it would be "inconceivable" and "totally incredible," (Pl.'s Mem. at 6) that LightPath could be unaware of the events and their materiality before July 26, and later asserts that LightPath was "undeniabl[y]" and "certainly" aware of those events, (id. at 12), before the closing of the private placement.

essentially admitting that there is no cause of action based on omission of the 4Q07 results themselves in July – but fails to articulate just how Defendants are expected to know the materiality of those events on 4Q07 results without having some sense of the results themselves. (Pl.'s Mem. at 20-21.) Plaintiff then abandons the "tie-breaking" language from *Top Tankers* to argue that LightPath's downsizing of its Orlando facility due to shifting production to Shanghai – a plausible nonculpable explanation of the downsizing mentioned in the September press release itself – should not be resolved in a motion to dismiss because it "gives rise to factual issues." (Id. at 21.) Apparently the only plausible nonculpable explanations Plaintiff would permit this Court to consider are ones that do not involve any facts.

Plaintiff's allegation that Defendants had motive and opportunity to commit fraud is similarly confusing. Rather than distinguishing the case law cited in Defendants' brief, Plaintiff relies on *Marcus v. Frome*, 329 F. Supp.2d 464 (S.D.N.Y. 2004). However, Plaintiff's analysis of *Marcus* is incorrect, and *Marcus* is easily distinguishable. In *Marcus*, the plaintiffs entered into an asset sale with Continuum in exchange for Continuum stock. The plaintiffs sued Continuum's outside law firm and a member of that firm, Frome, who at the time was also the president and a director of Continuum, alleging numerous material misstatements in the Purchase Agreement and Opinion Letter, both of which had been drafted by Continuum's law firm at Frome's direction. *Id.* at 469-71. Specifically, and unlike the instant case, the *Marcus* plaintiffs identified seven factual misstatements in the Purchase Agreement that was signed by Frome and prepared by Frome's law firm, including, for example, representations that Continuum had no debts or liabilities other than those in the Purchase Agreement and that Continuum was a Delaware corporation in good standing, when Continuum had failed to pay certain franchise taxes, had been involved in bankruptcy proceedings the year before, and was not in compliance

4

with the Joint Plan of Reorganization, which had also been signed by Frome. *Id.* In connection with the transaction and in addition to the assets received by Continuum, Frome, his law firm and his family all received additional Continuum stock. *Id.* at 471. Notably, plaintiffs did not sue Continuum. *Id.* at 467 n.1. In addition to signing all of the corporate documents, Frome was alleged to have participated in the bankruptcy proceedings as well as the transaction with plaintiffs. *Id.* at 470-71.

In finding that plaintiffs had alleged sufficient motive and opportunity to commit fraud by Frome and his law firm, Judge Koeltl focused on the Continuum stock received by Frome, his family and his law firm as the "concrete and personal benefits" received as a result of the transaction, and *not* (as Harborview alleges) on the benefits that *Continuum* received. *Id.* at 473. Further, Judge Koeltl found that Frome and his law firm had opportunity to commit the fraud because Frome's law firm prepared both the Purchase Agreement and the Opinion Letter containing numerous affirmatively false representations; Frome authorized and directed the preparation of both and signed both documents; and Frome was directly and actively involved in the corporate transactions and events that rendered the Purchase Agreement and Opinion Letter materially misleading. *Id.* at 470-71.

The instant case is not factually similar to *Marcus* at all. Here, Plaintiffs' only allegation of motive is that LightPath received money from the transaction with Harborview and the other investors. (Pl.'s Mem. at 23.) Not only is this insufficient to find motive for LightPath to commit fraud, it does not mention any "concrete and personal" benefits to Messrs. Brizel or Ripp whatsoever. Further, the only opportunity alleged against the individual defendants is their "ability to control the dissemination of information" about LightPath. (Id.) As for LightPath's purported opportunity, Plaintiff makes the circular argument that "obviously" it had the

5

opportunity to commit fraud through its allegedly fraudulent statements. (Id.) Defendants' vaguely-alleged opportunity – by controlling information and including representations and warranties in the Securities Purchase Agreement – is just not analogous to the extended and particularized involvement of Frome and his law firm in *Marcus*.

C.  **Harborview has not pleaded a single element of control person liability.**

Again, Plaintiff ignores relevant Second Circuit case law and cites a case on control person liability in the broker-dealer context, where the control person was the corporate employer of the individual broker-dealer who committed fraud by making short sales using various accounts, including her employer's proprietary trading account. *See Compudyne Corp. v. Shane*, 453 F. Supp.2d 807, 830 (S.D.N.Y. 2006) (J. Sweet). In *Compudyne*, Shane's employer did not dispute the existence of a primary violation or that it had control over its employee; the only remaining issue, then, was whether the broker-dealer's failure to properly supervise its employee's activities constituted culpable participation. *Id.* at 830-31. In finding culpable participation in the employer's failure to supervise, Judge Sweet explicitly distinguished Shane's agency relationship with her employer from cases where the alleged control persons were company officers and outside directors. *Id.* at 831 (noting that cases addressing Section 20(a) liability for corporate officers and directors are not analogous to Section 20(a) liability of "defendant banks/broker-dealers for the fraudulent acts of their agents").

Finally, Plaintiff offers no explanation for changing its allegation that Mr. Ripp "was leading" efforts to terminate Mr. Brizel in September to Mr. Ripp "had played the lead role in terminating" Mr. Brizel. (Pl.'s Mem. at 24.) But Mr. Ripp's statement in September, no matter which of Plaintiff's versions is accepted as true for purposes of this motion, establishes *nothing* about Mr. Ripp's alleged control of LightPath or culpable participation in any fraud before July

6

26. Even coupled with Plaintiff's allegation that Mr. Ripp signed Mr. Brizel's employment agreement the previous February, Plaintiff has only alleged facts to support an inference that Mr. Ripp played a role in Mr. Brizel's employment, but this is no substitute for pleading Mr. Ripp's "actual control over the [allegedly fraudulent] transaction in question" and his culpable participation therein. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (J. Marrero).

## II. PLAINTIFF CANNOT STATE A CLAIM FOR BREACH OF WARRANTY

Plaintiff's heavy reliance on its purported breach of warranty claim is considerably misplaced. First, as set forth above, Plaintiff has failed to state claims for securities fraud or control person liability. Since those federal claims should be dismissed, and since Plaintiff has pleaded no other basis for this Court's jurisdiction, the Court should decline to exercise jurisdiction over Plaintiff's breach of warranty claim. *See* 18 U.S.C. § 1367(c)(3); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) (stating that "where the federal claims are dismissed before trial, the state claims should be dismissed as well"); *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2006) (J. Stanton) (declining to exercise supplemental jurisdiction over state law claims where securities fraud claims were dismissed). Moreover, as discussed below, Plaintiff's claim also fails because Plaintiff cannot allege any facts that would state a claim for breach of warranty.

Unable to show that any Material Adverse Effect had occurred as of July 26, 2007, Plaintiff resorts to arguing that the warranty in Section 3.1(i) of the Securities Purchase Agreement is breached if events had occurred by July 26 that *could* conceivably have a material adverse effect on the operations, assets, business or condition of LightPath at some indeterminate time in the future. (Pl.'s Mem. at 5.) Plaintiff refers to no case law to suggest that any court has

engaged in such a speculative analysis, and then ignores the plain language of the Securities Purchase Agreement that requires a Material Adverse Effect to affect the operations, assets, business or condition of LightPath "taken as a whole." Instead, Plaintiff relies on the various isolated events and one-time charges disclosed in LightPath's September 19, 2007 press release and on Mr. Brizel's September 18 departure from LightPath. However, none of these events is sufficient to state a claim for breach of warranty.

The late shipments due to operational issues and one-time charges due to glass yield issues that occurred during 4Q07 are insufficient to state a breach of warranty because those isolated events did not have a material effect on the company "*taken as a whole.*" *See* Securities Purchase Agreement, § 3.1(b). Plaintiff blithely rewrites the warranty to eliminate this qualifier by ignoring numerous metrics that show a positive trend between 2006 and 2007 overall, and only comparing a decline in metrics between two non-consecutive quarters. (See Am. Cmpl. ¶ 16; Defs.' Mem. at 23-24.) This is not sufficient to state a claim, particularly where Plaintiff has not alleged that any of the events it relies on had any long-term effect on the company. *See In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001) (noting that a broad material adverse effect clause "is best read as a backstop protecting the acquiror from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner"). In *IBP*, the Delaware Chancery Court found no material adverse effect even though IBP's financials were the worst they had been in years and earnings were 64% lower than they had been for the comparable period in the previous year. *Id.* at 69-72. Here, even using the metric and comparison most favorable to Plaintiff, LightPath's decline in

sales between 4Q07 and 4Q06 was only 33%.[2]

Plaintiff's allegations regarding Mr. Brizel's termination are illogical and irrelevant. It is unclear how Plaintiff's gratuitous and unfounded characterization of LightPath's search for a replacement for Mr. Brizel in September 2007 – and LightPath's subsequent appointment of Mr. Gaynor to the position in January 2008 – has anything to do with an alleged breach of warranty in June or July 2007. Similarly, LightPath's stock price in September sheds no light on whether a material adverse effect had occurred months before.

Plaintiff's erroneous view that the warranty at issue can be breached by isolated, short-term operational hiccups in a single quarter without regard to their long-term effect or their effect on the company as a whole must be rejected. *See In re IBP*, 789 A.2d at 68, 71 n.170 ("short-term hiccup in earnings should not suffice" to support material adverse effect; recognizing that "even good businesses do not invariably perform at consistent levels of profitability"). Such a reading of LightPath's warranty against Material Adverse Effects would essentially swallow the remainder of the Securities Purchase Agreement and would grant Plaintiff the unwarranted benefit of a risk-free investment. Nothing in the warranty itself nor any of the cases cited by Plaintiff supports such a result, and the Court should dismiss Plaintiff's warranty claim as well.

## CONCLUSION

The most glaring of all of the numerous defects in Plaintiff's Amended Complaint is its continued assertion, with no factual support, that the information disclosed by LightPath in

---

[2] Plaintiff's attempt to distinguish *IBP* on procedural grounds misses the point. There is no dispute here over LightPath's 4Q07 numbers; the only dispute is whether Plaintiff can, as a matter of law, rely on solely those numbers to state a claim that the company as a whole has suffered a material adverse effect. In *IBP*, numbers that were far worse – a 64% decline in earnings – were held not to constitute a material adverse effect.

September must have been known before July 26, the closing of the private placement. By arguing that LightPath should be liable for breach of warranty whether or not it knew or had any reason to know the financial effects of isolated operational issues and charges in the fourth quarter, Plaintiff essentially seeks to insulate from risk any investment in the period between the close of the accounting period and the public reporting of those results. In any event, Plaintiff has failed to plead any breach of warranty. Accordingly, Plaintiff's Amended Complaint should be dismissed in its entirety.

Dated: May 30, 2008

**BAKER & HOSTETLER LLP**

By: _____
Ona T. Wang (OW-5462)
Benjamin Pergament (BP-4719)
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200
(212) 589-4201 (fax)

*Attorneys for Defendants*