UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

HARBORVIEW MASTER FUND, LP,

                              Plaintiff,

          -v-

LIGHTPATH TECHNOLOGIES, INC.,
KENNETH BRIZEL and ROBERT RIPP,

                              Defendants.

----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

**USDS SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED: 1-30-09**

**MEMORANDUM AND ORDER**

07 Civ. 9228 (NRB)

          Plaintiff Harborview Master Fund, LP, brings this suit against defendants LightPath Technologies, Inc. ("LightPath" or the "company"), Kenneth Brizel and Robert Ripp, alleging federal securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a) respectively, as well as common law fraud and breach of warranty claims. Essentially, the First Amended Complaint[1] ("Compl." or the "complaint") alleges that defendants made false statements and failed to disclose material information during the course of negotiating and closing a private placement transaction with plaintiff. Defendants now move to dismiss the complaint

---

[1] Plaintiff filed the First Amended Complaint on January 31, 2008 after defendants moved to dismiss the original complaint.

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

As a threshold matter, we note that the issue presented in this motion is not whether plaintiff's case ultimately has merit. The question here is substantially narrower -- namely, whether plaintiff's allegations are properly brought in federal court as a securities fraud action. It should also be noted at the outset that plaintiff's claims are, as articulated, quite limited in scope. Plaintiff makes no argument that defendants breached a broader duty of disclosure to the market as a whole. Rather, plaintiff argues that defendants breached disclosure duties to plaintiff arising directly from the private placement transaction.

Plaintiff's circumscribed theory of liability creates certain legal consequences that fundamentally impact our analysis and conclusions here. Briefly put, we find that plaintiff's complaint fails to state a federal securities claim because, even assuming defendants made the alleged omissions and misstatements, the omissions were not materially misleading to plaintiff under the express terms of the written agreement governing the private placement, and the misstatements were not materially misleading because they constituted non-actionable "puffery."

2

This is not to say that plaintiff lacks a remedy under its fraud or breach of warranty claims, however.  We simply lack an independent basis for subject-matter jurisdiction over those claims.  The case, therefore, is dismissed without prejudice to plaintiff bringing this action in the appropriate state forum. The opinion below addresses in greater detail the legal underpinnings of these conclusions.

## BACKGROUND[2]

LightPath is a manufacturer of precision-molded aspheric optics, precision-molded infrared optics, Gradium glass products and high-performance fiber-optic collimators and isolators. (3/28/08 Wang Decl. Ex. 2 at 5.)  The company was incorporated under Delaware law in 1992, and its common stock trades on the NASDAQ.  (5/30/08 Wang Decl. Ex. 1 at 4; 3/28/08 Wang Decl. Ex. 3 at 5.)

### The Transaction

In or about June 2007, plaintiff was solicited through its general partner by LightPath's placement agent to make an investment in LightPath in connection with a private placement.

---

[2] The following facts have been drawn from the complaint, documents attached to the March 28, 2008 Declaration of Ona T. Wang ("3/28/08 Wang Decl.") and the May 30, 2008 Declaration of Ona T. Wang ("5/30/08 Wang Decl."), and the transcript from the November 7, 2008 oral argument in this matter ("Oral Arg. Tr.").

3

(Compl. ¶ 8.)   LightPath's efforts to attract plaintiff's investment were part of a broader fundraising campaign by the company during that period.   (Oral Arg. Tr. at 3-4.)   At that time, according to LightPath's public filings, the company had been operating with a negative cash flow, had "substantial cash requirements," and its inability to obtain additional financing or to raise more capital had created a risk that the company would be forced "to discontinue operations altogether."   (Compl. ¶ 9.)

As part of LightPath's efforts to solicit plaintiff's investment, a conference call was conducted on or about June 29, 2007 between LightPath's then-CEO, defendant Kenneth Brizel, and plaintiff's representatives.   (Compl. ¶ 12.)   Plaintiff alleges that during this call, "Brizel touted LightPath's products, markets, and technology, and represented to Harborview that the company was performing well, and that sales and profitability were on the rise."   (Id.)   Brizel also informed plaintiff's representatives that LightPath needed additional cash to expand the company's manufacturing capabilities in Shanghai.   (Id.)

About one month later on July 26, 2007, pursuant to a Securities Purchase Agreement ("SPA"), plaintiff purchased directly from LightPath 125,000 shares of LightPath stock at a price of $4 per share.   (Compl. ¶ 14.)   In addition, and also pursuant to the SPA, plaintiff received warrants to purchase an

4

additional 37,500 shares of LightPath stock at a price of $5.50 per share.   (Id.)

**The Share Purchase Agreement**

The SPA contains several provisions directly relevant to the instant dispute.   First, under the SPA's warranty clause, LightPath represented that "[s]ince the date of the latest audited financial statements included within the SEC report . . . there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect."   (3/28/08 Wang Decl. Ex. 1 at § 3.1(i).)   The SPA defined "Material Adverse Effect" to include "a material adverse effect on the results of operations, assets, business or condition (financial or otherwise) of the Company and the subsidiaries, taken as a whole."   (Id. at § 3.1(c).)

The SPA also provided that LightPath "confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information."   (3/28/08 Wang Decl. Ex. 1 at § 3.1(y).)   Further, the SPA stated, "the Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-

public information, unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality of such information." (Id. at § 4.6.) Finally, the SPA contains an integration clause stating that "[t]he Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral and written, with respect to such matters." (Id. at § 5.3.)

### The September 19, 2007 Press Release

On September 19, 2007, LightPath issued a press release announcing that sales for the fourth quarter that ended June 30, 2007 were down $1.2 million, a decrease of 33 percent. (Compl. ¶ 16.) LightPath further disclosed that its fourth quarter revenue decline was, in part, the result of "about $362,000 of late shipments due to manufacturing operational issues," as well as "one time charges of $342,000 due to glass yield issues, overtime for direct labor, travel for engineering and management to resolve issues, and freight and duty expenses." (Id. ¶ 17.) LightPath's CFO stated in the press release, "To offset the poor financial performance in the fourth quarter, over the last few months the company has reduced the workforce in Orlando by 25 staff, bringing the headcount to 88." (3/28/08 Wang Decl. Ex. 2

at 5.)   In addition, the press release announced that Brizel was no longer employed by LightPath, that the company had engaged an executive search firm to conduct a search for a new CEO, and that LightPath's senior vice president for global operations would serve as interim CEO.   (Id. at 5-6.)

### The Allegations

Plaintiff's First Amended Complaint includes nine claims: two claims for breach of warranty against LightPath (Compl. ¶¶ 44-55); four claims alleging violations of Section 10(b) by LightPath, Brizel, or LightPath and Brizel together (id. ¶¶ 56-82); two "common law fraud" claims against LightPath and Brizel (id. ¶¶ 83-86); and one control-person liability claim brought against defendant Robert Ripp, chairman of the LightPath board of directors (id. ¶¶ 87-94).

### DISCUSSION

### I. Legal Standard

In considering defendants' motion to dismiss, we accept as true the facts alleged in the First Amended Complaint and draw all reasonable inferences in favor of plaintiff.   Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004); Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).   Although the complaint "does not need detailed factual

7

allegations" to survive a motion to dismiss, a "formulaic recitation of the elements of a cause of action" cannot suffice. Bell Atl. Corp. v. Twombly, -- U.S. --, 127 S. Ct. 1955, 1964-65 (2007). At a minimum, plaintiff must plead the facts underlying the claims sufficiently "to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Id. For purposes of a Rule 12(b)(6) motion, the complaint "is deemed to include any written instrument attached to it as an exhibit," "statements or documents incorporated in it by reference," and any other document that is "integral" to the allegations. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

In addition, the factual allegations in support of a securities fraud claim must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

8

were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

## II. Federal Securities Fraud Claims

In relevant part, Section 10(b) provides that it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5[3] further provides that it shall be unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

The Second Circuit has established that to show liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that: (1) in connection with the purchase or sale of a security, (2) the defendant, acting with scienter (3) made a material misrepresentation or (where there exists a duty to speak) a

---

[3] Curiously, the First Amended Complaint does not allege any violation of Rule 10b-5 -- only Section 10(b). However, plaintiff does allege a Rule 10b-5 violation in its papers in opposition to the motion to dismiss. (See Supplemental Memorandum of Law in Further Opposition to Defendants' Motion to Dismiss ("Suppl. Opp.") at 5 ("Harborview has sufficiently pleaded a strong inference of scienter to state a Rule 10b-5 claim against Defendants . . . .").) We therefore consider the language of both the statute and the rule in our analysis.

9

material omission, or used a fraudulent device. <u>Grandon v.
Merrill Lynch & Co., Inc.</u>, 147 F.3d 184, 189 (2d Cir. 1998). In
the case of an omission, the duty to disclose generally "arises
when one party has information that the other [party] is
entitled to know because of a fiduciary or other similar
relation of trust and confidence between them." <u>Chiarella v.
United States</u>, 445 U.S. 222, 228 (1980) (internal quotation and
citation omitted).

Plaintiff alleges two omissions that it claims constitute
actionable violations of Section 10(b): (1) that although
defendants knew of "extraordinary adverse operational and
financial events and issues" during LightPath's fourth quarter
"at or about the time they occurred, and certainly by July 26,
2007," they failed to disclose that information before the
private placement closed (Memorandum of Law in Opposition to
Defendants' Motion to Dismiss ("Opp.") at 12; Compl. ¶ 25); and
(2) that defendants had decided to terminate Brizel by the time
the private placement closed, but failed to disclose that
decision until months later (Opp. at 12; Compl. ¶¶ 28-29). In
addition, plaintiff alleges that Brizel knew about LightPath's
financial and operational difficulties during the conference
call on June 29, 2007, making his statements "that the company
was performing well operationally and financially, and that
sales and profitability were on the rise . . . false and

10

misleading."    (Id.   ¶¶   57-58.)    Plaintiff   alleges,   "Had
Harborview   known,   as   of   July   26,   2007,   about   LightPath's
material  operational  and  financial  problems  incurred  during  its
fourth  fiscal  quarter,  or  about  LightPath's  plans  to  terminate
the  employment  of  its  long  time  CEO,  it  would  not  have  made  its
investment  in  LightPath."   (Id. ¶ 41.)

Below,  we  first  consider  the  alleged  omissions,  and  then
the  alleged  misstatements.

### A. Alleged Omissions

It  is  a  well-established  principle  of  federal  securities
law  that  silence  absent  a  duty  to  disclose  cannot  be  actionably
misleading,   and   the   mere   possession   of   material   nonpublic
information  does  not  create  a  disclosure  duty.   See  Chiarella,
445  U.S.  at  235.   Here,  plaintiff  contends  that  defendants'
alleged  omissions  violated  a  duty  to  disclose  that  arose  "in
connection    with"    LightPath's    solicitation    of    plaintiff's
investment.[4]  (Opp.  at  12.)   Plaintiff  first  argues  that  duty  was
created  when  subsequent  events  rendered  certain  of  defendants'

---

[4] Plaintiff does not argue that defendants violated a broader duty of
disclosure to the public at large.  Rather, plaintiff argues that defendants
violated a disclosure duty stemming specifically from the private placement
transaction at issue.  Plaintiff writes, "LightPath had a duty to disclose to
Harborview the following information prior to the close of Harborview's
purchase of LightPath securities: 1) LightPath's determination to terminate
Brizel; and 2) the admittedly extraordinary operational and financial events
that occurred during LightPath's fiscal fourth quarter.  If LightPath did not
want to disclose that information, it should not have closed the securities
purchase deal with Harborview."  (Suppl. Opp. at 2 (emphasis added).)

prior public statements materially misleading.  (Id. at 13-15.)
Alternatively, plaintiff alleges that "LightPath, as a seller of
securities by way of the private placement, had a legal duty to
either  disclose  what  is  clearly  insider  information,  or  to
abstain from selling its stock to Harborview and the investors
by way of the private placement."  (Id. at 15-16.)

### 1. Prior Public Statements Rendered Misleading

Plaintiff argues that defendants breached a disclosure duty
to them that was triggered when alleged events at LightPath
rendered certain statements materially misleading.  (Opp. at
13.)   Specifically,  plaintiff  argues  that  "LightPath  and
Brizel's failure to disclose the operational issues and problems
that LightPath had experienced during its fourth quarter, and
that it had lost complete confidence in and had decided to fire
defendant  Brizel,  rendered  false  and  misleading  LightPath's
statements, representations and warranty in the Stock Purchase
Agreement that '[s]ince the date of the latest audited financial
statements included in the SEC reports, there has been no event,
occurrence or development that has had or that could reasonably
be expected to result in a Material Adverse Event.'"  (Id.)   In
support of this argument, plaintiff states that the "law is
clear  that  'a  duty  to  disclose  arises  whenever  secret
information  renders  prior  public  statements  materially

12

misleading, not merely when that information completely negates the public statements.'" (Opp. at 13 (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993)).)

To the extent that plaintiff is saying that events following LightPath's last SEC filing rendered the warranty clause in the SPA misleading, it can certainly argue breach of warranty. What plaintiff cannot do, however, is argue that the disclosure of the SPA and its warranty clause in the July 26, 2007 Form 8-K created a duty to update a prior public statement. Indeed, plaintiff alleges no prior public statement that had been rendered untrue or misleading, and therefore articulates no basis for a federal securities fraud claim, even if we assume that defendants breached the SPA's warranty.[5]

Plaintiff also argues that by the time the private placement transaction closed, subsequent events had rendered two prior statements in LightPath's Form 10-Ks materially misleading. The first statement, appearing in LightPath's Form 10-K for the fiscal year ending June 30, 2006 reads:

> We Rely On The Efforts Of Our Chief
> Executive Officer, And The Loss Of His
> Services Could Materially Adversely Affect

---

[5] Plaintiff does not attempt to argue that LightPath's July 26, 2007 Form 8-K was itself false and misleading, and therefore a violation of Section 10(b). Even assuming that were true, however, that fraud would not have occurred until after the private placement transaction at issue here was consummated, raising questions about whether plaintiff could successfully establish reliance. Plaintiff also does not raise, and we therefore need not decide, the question of whether a public shareholder could make a securities fraud claim based on that Form 8-K.

> Our Business.  Our success will be largely
> dependent  on  the  personal  efforts  and
> abilities  of Kenneth Brizel, our President
> and Chief Executive Officer.  If Mr. Brizel
> end[s]  his  relationship  with  the  company
> before  a  qualified  replacement  is  found,
> then our business, prospects and results of
> operations  could  be  materially  adversely
> affected.

(Compl. ¶ 32 (emphasis in original)).  The second statement,

appearing  in  LightPath's  Form  10-K  for  its  fiscal  year  ending

June 30, 2007, reads:

> [t]here can be no assurance that we will be
> able  to  employ  a  candidate  with  the
> qualities  and  experience  we  desire  under
> terms  and  conditions  acceptable  to  us.  Our
> business, prospects and results of operation
> could be materially adversely affected as we
> seek a replacement for Mr. Brizel and such
> adverse  affects  could  continue  if  we  are
> unable to employ a qualified candidate for
> position in a timely manner.

(Id. ¶ 33 (emphasis added by plaintiff in complaint)).

As plaintiff itself acknowledges, the quoted language comes

from the LightPath Form 10-K "risk factors" section, which also

warns, "An investment in our common stock is extremely risky. .

.  .  Our  business  and  the  results  of  operations  could  be

seriously harmed by any of the following risks.  The trading

price of our common stock could decline due to any of these

risks,  and  you  may  lose  part  or  all  of  your  investment."

(5/30/08 Wang Decl. Ex. 1 at 11.)  Even assuming that Brizel's

termination  was  inevitable  prior  to  the  private  placement's

closing -- a point that defendants vigorously contest -- risk factor warnings about the possible consequences of his termination would not have been rendered materially misleading simply because he was, in fact, terminated.[6]

These risk factor disclosures are thus very different from the statements at issue in New Jersey v. Sprint Corp., which plaintiff cites.   In that case, Sprint's public disclosures included representations that it had "entered into new employment contracts with [two corporate officers] designed to insure their long-term employment with Sprint."   314. F. Supp. 2d 1119, 1130, 1132-33 (D. Kan. 2004) (holding on motion to dismiss that statements about insuring officers' long-term employment were rendered misleading by the failure to disclose the alleged "possibility or inevitability" that they might be terminated).   Here, rather than describing efforts made to retain Brizel, LightPath's Form 10-Ks included statements about the potential consequences that could be triggered by his departure.   Those statements were not rendered misleading just because the triggering event actually occurred.

---

[6] Plaintiff does not argue here that LightPath failed to satisfy a general disclosure obligation to the market as a whole regarding Brizel's continued employment prospects.   Nevertheless, it is worth noting that on the date LightPath announced that Brizel was no longer employed by the company, it also announced that it had retained an executive search firm to aid in selecting a new CEO.   (See 3/28/08 Wang Decl. Ex. 2 at 5.)   This suggests, at least, that Brizel's departure had not been in the works long enough to choose his successor prior to the September 19, 2007 announcement, let alone prior to the execution of the SPA two months earlier.

### 2. Disclose or Abstain

As plaintiff notes, the "disclose or abstain" principle of insider training law applies not just to individuals, but to corporate issuers.   See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1203 (1st Cir. 1996); McCormick v. Fund Am. Cos., Inc., 26 F.3d 869, 876 (9th Cir. 1994).   As such, a misleading omission by LightPath in the context of the private placement transaction could theoretically provide the basis for a Section 10(b) claim.   For purposes of this particular transaction, however, even assuming _arguendo_ that defendants were aware of the so-called "adverse operational and financial events" at LightPath and the possibility that Brizel would be terminated, to the extent that their failure to disclose that information could be called "omissions," such omissions could not have been materially misleading to plaintiff under the terms of the SPA. As such, plaintiff's federal securities law claims with respect to those alleged omissions fail.

The SPA specifically provided, "[LightPath] confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information." (3/28/08 Wang Decl. Ex. 1 at § 3.1(y).)   The SPA further stated that it represented the

"entire understanding of the parties" with respect to the transaction. (Id. at § 5.3.)  Thus, by signing the SPA, plaintiff (1) acknowledged that defendants had given it no access to material non-public information and (2) agreed that, in proceeding with the transaction, it was relying solely on the information contained in the SPA itself.  The SPA clearly notified plaintiff that defendants were not disclosing certain information.  In other words, plaintiff "knew what [it] didn't know."  See Jensen v. Kimble, 1 F.3d 1073, 1078 (10th Cir. 1993).

We find Jensen instructive here.  In that case, Kimble, a lawyer representing Sage Court Ventures, requested that Jensen, a shareholder of Sage Court, sell him approximately one million shares of Sage Court stock at a below-market price.  Kimble informed Jensen that he was in the midst of negotiating a merger between Sage Court and another company, and that Jensen's sale might facilitate that merger and a subsequent public offering of the new, merged company's stock.  Jensen could then expect the value of his remaining Sage Court shares to increase substantially.  When Jensen asked Kimble to identify the other parties involved in the proposed merger, Kimble refused.  Jensen decided to proceed with the sale of his stock anyway.  The merger ultimately occurred, but efforts at a public offering faltered, leading Jensen to sue Kimble, alleging material

misrepresentations and omissions in violation of Rule 10b-5. The Tenth Circuit affirmed summary judgment against Jensen, stating that "because Kimble specifically advised Jensen of [the] nondisclosures . . . Jensen sold [his] stock with full awareness of Kimble's omissions." Id. at 1077. The court explained that "where the non-disclosing party explicitly informs the other party of his failure to disclose, an omission will not be misleading in the absence of special circumstances such as the inability of the dependant party to understand or appreciate the significance of the undisclosed information." Id. at 1078. Such "special circumstances" did not exist in that case, where Jensen was a "very experienced, sophisticated investor who was under no compulsion to sell" his shares. Id. at 1078 n.9.

Likewise, plaintiff here is a sophisticated investment fund that was under no compulsion to invest in LightPath. During the period when the private placement transaction was being negotiated, plaintiff could have demanded disclosure of all material non-public information and conducted its own diligence. Indeed, the SPA expressly provided that plaintiff could receive non-public information if it consented to a non-disclosure agreement. (See 3/28/08 Wang Decl. Ex. 1 at § 4.6.) Further, Regulation FD, which applies to private placement transactions like the one at issue here, authorizes the use of a non-

18

disclosure agreement so as to limit an issuer's disclosure obligations solely to the purchaser. See 17 C.F.R. § 243.100(b)(2)(ii).[7] Plaintiff never sought such a non-disclosure agreement, and the limited record here provides no explanation for its decision not to take the opportunity to scrutinize LightPath more rigorously before committing to the private placement. We can only speculate that plaintiff viewed the costs associated with conducting formal diligence to be too high, given the relatively small amount of money it was considering investing in LightPath. Indeed, we expect that a sophisticated investor like plaintiff would have negotiated a more favorable purchase price to account for the risk arising from its lack of access to LightPath's material non-public information.[8]

---

[7] Regulation FD states, in relevant part, "Whenever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to any person . . . the issuer shall make public disclosure of that information."  17 C.F.R. § 243.100(a).  However, this requirement "shall not apply to a disclosure made . . . [t]o a person who expressly agrees to maintain the disclosed information in confidence."  17 C.F.R. § 243.100(b)(2)(ii).

[8] Interestingly, the language of the SPA here is quite similar to that of a so-called "big boy" letter. Big boy letters are "agreements between parties to a securities transaction where one party, typically the seller, has material, nonpublic information that it does not want to disclose."  Edwin D. Eshmoili, Big Boy Letters: Trading on Inside Information, 94 Cornell L. Rev. 133, 135 (2008).  A big boy letter contains representations by the signatory that "it is financially sophisticated; it is aware that the counterparty may have material, nonpublic information that may affect the value of the traded securities; it realizes that it is not privy to any such information, if there is any; it is not relying on any of its counterparty's nondisclosures, if there are any; it is not relying on any representations not expressly set forth in the big boy letter; it is waiving all claims against its counterparty arising out of the nondisclosure; and finally, it realizes the effect of this waiver and elects to proceed with the transaction, essentially

In any case, based on the terms of the SPA, we conclude
that LightPath had no more of a duty to disclose information to
plaintiff than it had to the general public, and it must be
recalled that plaintiff does not argue that defendants have
violated any broader duty of disclosure to the market as a
whole.[9]  Therefore, even assuming that defendants were aware of
material information regarding adverse events at LightPath or
Brizel's continued employment prospects before the private
placement closed and failed to disclose that information, it
would be unreasonable to allow plaintiff -- who had the
opportunity to gain access to any such information but chose not

_____

stating, 'I am a big boy.'"  Id.  To compensate for its assumed risk, a buyer
in a transaction involving a big boy letter may demand the securities at a
discounted price.  If the seller agrees to trade the securities at a below-
market price, this may serve to indicate that the non-disclosed information
is adverse.  See id. at 147.  Although no court has yet ruled on the
enforceability or effect of big boy letters, they have been "widely used in
securities transactions for years."  Id. at 135-37.

[9] Although plaintiff makes no attempt to argue that defendants were obligated
to disclose to the market as a whole their operational difficulties prior to
the September 19, 2007 press release (Oral Arg. Tr. at 26), defendants
contend that no general duty of disclosure was triggered because those
developments were not material and were foreseeable to a reasonable investor.
(Id. at 27.)  With respect to the $362,000 in late shipments (Compl. ¶ 17),
defendants argue that amount does not represent a loss of revenue, but rather
revenue that merely would not be booked until the following quarter.  (Oral
Arg. Tr. at 27.)  Further, defendants contend that LightPath's problems with
delayed shipments had been noted in public financial statements for the
second and third quarters of 2007.  (Id.)  With respect to the "one time
charges of $342,000 due to glass yield issues, overtime for director labor,
travel for engineering and management to resolve issues, and freight and duty
expenses" (Compl. ¶ 17), defendants emphasize that those charges did not
occur in a single lump sum, and that they were foreseeable start-up expenses
arising from LightPath's transfer of production operations to China -- a
transition that LightPath had previously disclosed.  (Oral Arg. Tr. at 28-
29.)  Irrespective of these points, given plaintiff's acknowledgment in the
SPA that it was entering into the private placement transaction without the
benefit of any material non-public information from LightPath, we need not
reach defendants' arguments regarding materiality.

to request it -- to now recover under federal securities law for such omissions to which it contractually agreed. Under these circumstances, any omission could not have been misleading to plaintiff.[10]

We also believe that our reasoning here is compatible with Section 29(a) of the Securities Exchange Act.[11]   That statute provides, "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc. The Supreme Court has stated that Section 29(a) forbids the "enforcement of agreements to waive 'compliance' with the provision of [the Exchange Act]" or "waiver[s] of the substantive obligations imposed by the Exchange Act. Shearson/Am. Ex., Inc. v. McMahon, 482 U.S. 220, 228 (1987). The parties' levels of sophistication are a relevant factor in determining whether a release violates Section 29(a).   See

---

[10] Shaw v. Digital Equipment Corp., cited by plaintiff, is not to the contrary.   That case involved a corporation's issuing of stock pursuant to a "shelf registration" under SEC Rule 415(a) -- not a private placement transaction involving sophisticated parties and governed by a share purchase agreement that expressly stated the purchaser had no access to material non-public information pertaining to the issuer, like in the instant case.   See Shaw, 82 F.3d at 1208.

[11] At oral argument, we asked the parties to provide supplemental briefing on the question of whether the SPA's language prevented defendants' alleged misstatements from being actionably misleading under federal securities law. Neither party raised Section 29(a) in those supplemental briefs. Nevertheless, in the interest of being comprehensive, we provide our own discussion of that provision and its bearing on our analysis above.

Petro-Ventures, Inc. v. Takessian, 967 F.2d 1337, 1342 (9th Cir. 1992) (holding that sophisticated parties could waive future securities claims without violating Section 29(a), and noting that when "a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, . . . the intent of the parties [is] indicated by the language employed").

The SPA here did not waive compliance with defendants' substantive obligations under the Securities Exchange Act. On the contrary, as discussed above, the SPA merely served to memorialize two sophisticated parties' understanding that plaintiff, having not signed a non-disclosure agreement, was entering into the transaction without access to any material non-public information regarding LightPath and based solely on the information contained within the agreement itself. Put another way, by signing the SPA, the parties were agreeing that the private placement transaction would create no disclosure obligation beyond LightPath's duties under federal securities law irrespective of that transaction. Such an agreement is not contrary to Section 29(a).

In holding that defendants did not violate the "disclose or abstain" rule here, we think it is appropriate to acknowledge the important role that rule plays in ensuring the integrity and

efficiency of the securities markets.   See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 236 (2d Cir. 1974); SEC v. Texas Gulf Sulfur Co., 401 F.2d 833, 848 (2d Cir. 1968) ("the Rule is based in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information").   "The rule eliminates both the incentives that insiders would otherwise have to delay the disclosure of material information, and minimizes any efficiency losses associated with the diversion of resources by insiders to 'beating the market.'"   Shaw, 82 F.3d at 1203 (citing Robert C. Clark, Corporate Law § 8.2, at 273-75 (1986); Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 288 (1991) ("The lure of trading profits may induce people to spend a lot of effort and other resources 'beating the market'; . . . The prompt disclosure of information by the affected firm will extinguish the trading opportunity. When everyone knows the truth, no one can speculate on it.")).

In this case, market efficiency and integrity were not compromised.   This was not an open market offering, like in Shaw.   The transaction here was a private placement of securities, negotiated at arm's length by sophisticated parties. Regulation FD provided a vehicle by which plaintiff could have had access to LightPath's material non-public information

without triggering broader disclosure obligations -- a non-disclosure agreement. For whatever reason, plaintiff did not want any material non-public information, did not pursue a non-disclosure agreement, and acknowledged as much by signing the SPA. Plaintiff cannot now complain that it was misled.


### B. Alleged Misstatements

Plaintiff also contends that Brizel knew about LightPath's financial and operational difficulties during the conference call on June 29, 2007, making his statements "tout[ing] LightPath's products, markets, and technology, and represent[ing] to Harborview that the company was performing well, and that sales and profitability were on the rise" false and misleading. (Compl. ¶¶ 12, 57-58.) We find this claim to be unpersuasive.[12]

Such a vaguely alleged misstatement does not satisfy Rule 9(b) and is far too general to support a federal securities fraud claim. At worst, Brizel's statements are non-actionable corporate puffery. The Second Circuit has made clear that "general announcements" that a company is optimistic about earnings and expects a product to perform well "cannot constitute actionable statements under the securities laws"

---

[12] To the extent that plaintiff alleges material omissions by Brizel, those allegations fail for the reasons set forth in Part II.A.

because they would not mislead a reasonable investor. See,
e.g., San Leandro Emergency Med. Group Profit Sharing Plan v.
Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996.)  Likewise,
statements expressing optimism about current and future economic
growth are too non-specific to be actionable.  Id. at 806, 810-
11; see also Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55,
59 (2d Cir. 1996).  Brizel's statements as alleged in the
complaint are likewise too general to support a securities fraud
claim.[13]

     In addition, it is worth noting that the SPA expressly
provided that the transaction documents encompassed in the SPA
"contain the entire understanding of the parties with respect to
the subject matter hereof and supersede all prior agreements and
understandings, oral and written . . . ."  (3/28/08 Wang Decl.
Ex. 1 at § 5.3.)  As such, even were we to conclude that
Brizel's statements were actionable -- and we do not -- they
could not have been misleading to plaintiff, which, under the
SPA, acknowledged that it was not relying upon them.

     In summary, because we find based on the analysis above
that plaintiff has alleged no actionably misleading omission or
misstatement by LightPath or Brizel, plaintiff's claims under

---

[13] Further, Brizel's optimism seems to have had support.  LightPath's sales
and revenue for fiscal year 2007 were higher than for fiscal year 2006.
(Mem. at 8.)

Section 10(b) fail.  As a result, defendants' motion to dismiss those claims is granted.[14]

### C. Control-person Liability

Plaintiff's complaint also includes a control-person liability claim under Section 20(a) of the Securities Exchange Act against Ripp.  That statute reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.  To establish a prima facie case of control-person liability, plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was "in some meaningful sense" a culpable participant in the fraud perpetrated by controlled person.  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996).

---

[14] Having concluded that plaintiff has failed to allege any materially misleading misstatement or omission that is actionable under Section 10(b), we need not consider defendants' alternate argument that plaintiff has failed to adequately plead a strong inference of scienter.

For the reasons set forth above, plaintiff here has failed to plead a primary violation under Section 10(b). As such, its claim under Section 20(a) likewise fails.

## III. **Remaining Pendent Claims**

Plaintiff also alleges breach of warranty claims against LightPath, and common law fraud claims against LightPath and Brizel. The parties agree that without the federal securities fraud claims, there is no basis for subject-matter jurisdiction over these remaining claims. (Oral Arg. Tr. at 2.) While the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent state-law claims where all of the federal claims have been dismissed, "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966). We therefore decline to exercise supplemental jurisdiction over plaintiff's pendent claims, which are dismissed without prejudice to their renewal in an appropriate forum. While we have found that plaintiff may not proceed in this Court, we emphasize that our dismissal here should not be

read as a commentary on the merits of plaintiff's breach of warranty claim.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted. Accordingly, the Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

Dated:     New York, New York
           January 30, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Counsel for Plaintiff**

Ross J. Ellick, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
900 Third Avenue, 16th Floor
New York, NY 10022-4728

**Counsel for Defendants**

Ona T. Wang, Esq.
Benjamin Pergament, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111